GENERAL INSURANCE COMPANY
OF AMERICA, Plaintiff,

v.

K. CAPOLINO CONSTRUCTION CORP.,
K. Capolino Design and Renovation,
Ltd., Kenneth L. Capolino, Patricia M.
Capolino and White Plains Housing Au-
thority, Defendants,

Myron C. Simon, Mary Burwell, Lawrence
Salley, Robert Feder, Isador Feldshon, J.
Michael Divney and Anthony Tascione,
Additional Defendants.

No. 94 CIV. 8089(WCC).

United States District Court,
S.D. New York.

Oct. 7, 1997.

Hart & Hume, New York City (Cecil Holland, Jr., of Counsel), for Plaintiff.

Meyer & Wild, New York City (Edward Meyer, Patricia B. Wild, of Counsel), for Defendants K. Capolino Construction Corp., K. Capolino Design and Renovation, Ltd., Kenneth L. Capolino and Patricia M. Capolino.

Calotta Levine Samuel, L.L.P., New York City (Gerald M. Levine, of Counsel), for Defendants White Plains Housing Authority and Anthony Tascione.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff General Insurance Company of America ("General") brought this action against defendants K. Capolino Construction Corp. ("the Capolino firm"), K. Capolino Design and Renovation, Ltd., Kenneth L. Capolino ("Capolino") and Patricia M. Capolino seeking indemnification for costs it incurred in completing construction contracts on two housing developments owned by the White Plains Housing Authority ("the Authority") for which General had issued performance bonds on the Capolino firm's behalf. General stepped in and completed the jobs at the request of the Authority, after several disputes arose between the Authority and Capolino over the nature and scope of the work required to be performed under the contracts, and over payment to Capolino for work he asserts his firm had completed. We have jurisdiction under 28 U.S.C. § 1332.

After our November 9, 1995 Opinion and Order denying cross-motions for summary judgment, on March 6, 1996 General amended its complaint to add claims in the alternative against the Authority in the event that it be determined at trial that the Authority breached the contracts. These claims were: for unjust enrichment (Claim 4); for indemnity against any recovery by Capolino on its counter claims (Claim 5), and for unpaid monies for alleged extra work performed to complete the projects (Claim 6). In its March 29, 1996 Answer to General's Amended Complaint, defendant Authority brought five cross-claims against Capolino. These claims were: for declaratory judgment of the rights of the parties to terminate the Winbrook contract and to call upon General to complete the contract (Auth. Cross–Claim 1); for declaratory judgment of the rights of the parties to terminate the Schuyler contract and to call upon General to complete the contract (Auth. Cross–Claim 2); for restitution against Capolino for monies it was overpaid on the Winbrook contract (Auth. Cross–Claim 3); for damages it incurred as a result of Capolino's breach of the Winbrook contract (Auth. Cross–Claim 4); for damages it incurred as a result of Capolino's breach of the Schuyler contract (Auth. Cross–Claim 5). Capolino then cross-claimed against the Authority for breach of contract (Cap. Cross–Claim 1) and against Anthony Tascione for negligent misrepresentation (Cap. Cross–Claim 2).[1] Capolino and General have since settled all of their claims and counterclaims. (See 2/27/97 Stip. and Order Dismissing Certain Claims).[2]

This Court conducted a non-continuous eight-day bench trial beginning March 11, 1997 and concluding April 3, 1997. This opinion constitutes the court's findings of fact and conclusions of law pursuant to FED. R.CIV.P. 52(a).

### FINDINGS OF FACT

#### I. BACKGROUND

Plaintiff General is a Washington corporation, duly authorized to engage in the business of suretyship in the state of New York.

Defendant Authority is a corporate entity duly constituted under Article 13, Title 19,

---

**1.** Capolino's second cross-claim originally alleged that six of the Authority's Commissioners also made negligent misrepresentations. In our February 28, 1997 Opinion and Order, we dismissed these claims against the Commissioners.

**2.** In connection with the settlement of these claims, General has also dropped its fifth claim against the Authority, which had demanded restitution for any monies General might be found to owe Capolino on Capolino's counterclaims. (See 9/12/97 Stip. and Order Dismissing Plaintiff's Fifth Claim for Relief.)

§ 422 of the New York Public Housing Law. It is the owner and operator of low-income, low-rent residential buildings in the City of White Plains, including Winbrook Houses ("Winbrook") and Schuyler DeKalb Apartments ("Schuyler"). At all times relevant to this dispute, the Executive Director of the Authority was Anthony Tascione. (Stip. of Agreed Facts ("Stip.") # 3.) Tascione was also the Contracting Officer. (Tasc., 639.) [3]

The Capolino firm is a New York corporation. It is a general contractor with its principal place of business in White Plains. The Capolino firm is owned by Patricia Capolino; its President during all times relevant to this suit was her husband Kenneth Capolino.

In the summer and early fall of 1991, the Authority sought bids from qualified contractors to undertake improvements on Winbrook in accordance with a set of contract documents and specifications. The Capolino firm was the low bidder and on or about February 19, 1992 a $263,773 contract for improvements to Winbrook was signed by Kenneth Capolino on behalf of the Capolino firm and by Anthony Tascione, on behalf of the Authority. Additional improvements for the cold water make-up lines were authorized by Board Resolution in the amount of $45,000 and by Change Order # 1 in the amount of $1,219, for a total contract sum of $309,992. In accordance with the contract, the Capolino firm delivered to the Authority performance and payment bonds issued by General. (Stip.# # 10, 12.)

In the late fall of 1991, the Authority sought bids from qualified contractors to undertake improvements to Schuyler in accordance with a set of contract documents and specifications. The Capolino firm was again the low bidder, this time by approximately $73,227. (Exh. A86.) [4] Concerned whether the Capolino firm could perform the contract for that amount, the Authority sent a letter to Capolino and received assurances that it could do so. (Tasc., 635.) On or about May

11, 1992, a $235,743 contract for improvements to Schuyler was signed by Kenneth Capolino on behalf of the Capolino firm, and by Anthony Tascione on behalf of the Authority. In accordance with the contract, the Capolino firm delivered to the Authority performance and payment bonds issued by General. (Stip.# # 21–22.)

The Winbrook and Schuyler projects were both funded under HUD CIAP programs. Winbrook was CIAP 1989; Schuyler was CIAP 1990. Mr. Tascione testified at trial that the Authority had two years from the award of the monies under each CIAP to spend the monies awarded, and that it received the money for Winbrook in 1990 and for Schuyler in 1991. (Tasc., 769.) Thus, at the time it accepted bids for the contracts with completion dates in 1993, it knew that the Winbrook funding would expire prior to the completion date. However, Tascione testified that this was simply a "procedural matter, just updating so we continue to have that line of credit open to us." (*Id.* at 770.)

The contracts each incorporated by reference, among other things: A.I.A. document A201, entitled "General Conditions for the Contract for Construction" (the "A.I.A. General Conditions"); a Department of Housing and Urban Development ("HUD") document entitled "General Conditions of the Contract for Construction—Public Housing Program" (the "HUD General Conditions"); and Division 1 General Requirements ("the General Requirements"). (Stip.# 11.)

At all times relevant to this lawsuit, the Modernization Coordinator for the Authority was Gilbert A. Galli ("Galli") and the architects for the Winbrook and Schuyler contracts were Gismondi and Arnold, P.C., whose principal was Bernard S. Arnold ("Arnold"). The consulting engineers engaged by the Architect for the Winbrook project were Michael K. Dalton, Associates, whose principal was Michael K. Dalton ("Dalton").

In August of 1992, a dispute arose between the Authority and Capolino over the payment

---

**3.** This is a reference to Tascione's testimony at trial, followed by the page of the transcript.

**4.** Throughout this opinion, we refer to Capolino's exhibits numerically: 1, 2, 3, etc. We refer to

the Authority's exhibits with both an alphabetic and numeric character: A1, A2, A3, etc. We refer to General's exhibits as Pl. Exh. 1, Pl. Exh. 2, etc.

of progress payments to Capolino on both contracts.

Regarding payment to the Contractor, the A.I.A. General Conditions provide:

### 9.3 APPLICATIONS FOR PAYMENT

**9.3.1** At least ten days before the date established for each progress payment, the Contractor shall submit to the Architect an itemized Application for Payment for operations completed in accordance with the schedule of values....

\* \* \*

**9.3.1.2** Such applications may not include requests for payment of amounts the Contractor does not intend to pay to a Subcontractor or material supplier because of a dispute or another reason.

**9.3.2** Unless otherwise provided in the Contract Documents, *payments shall be made on account of materials and equipment delivered and suitably stored* at the site for subsequent incorporation in the Work....

**9.3.3** The Contractor warrants that title to all Work covered by an Application for Payment will pass to the Owner no later than the time of payment. The Contractor further warrants that *upon submittal of an Application for Payment all Work for which Certificates for Payment have been previously issued and payments received from the Owner shall, to the best of the Contractor's knowledge, information and belief, be free and clear of liens,* claims, security interests or encumbrances in favor of the Contractor, Subcontractors, material suppliers, or other persons or entities making a claim by reason of having provided labor, materials and equipment relating to the Work.

### 9.4 CERTIFICATES FOR PAYMENT

**9.4.1** *The Architect will, within seven days* after receipt of the Contractor's Application for Payment, *either issue to the Owner a Certificate for Payment,* with a copy to the Contractor for such amount as the Architect determines is properly due, *or notify the Contractor and Owner, in writing of the Architect's reasons for withholding certification in whole or in part as provided in Subparagraph 9.5.1.*

**9.4.2** *The issuance of a Certificate for Payment will constitute a representation by the Architect* to the Owner, based on the Architect's observations at the site and the data compromising the Application for Payment, *that the Work has progressed to the point indicated and that, to the best of the Architect's knowledge, information and belief, quality of the Work is in accordance with the Contract Documents.* The foregoing representations are subject to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, to results of subsequent tests and inspections, to minor deviations from the Contract Documents correctable prior to completion and to specific qualifications expressed by the Architect. The issuance of a Certificate for Payment will further constitute a representation that the Contractor is entitled to payment in the amount certified.

### 9.5 DECISIONS TO WITHHOLD CERTIFICATION

**9.5.1** The Architect may decide not to certify payment and may withhold a Certificate for Payment in whole or in part, to the extent reasonably necessary to protect the Owner, if in the Architect's opinion the representations to the Owner required by Subparagraph 9.4.2 cannot be made. If the Architect is unable to certify payment in the amount of the Application, the Architect will notify the Contractor and owner as provided in Subparagraph 9.4.1. *If the Contractor and Architect cannot agree on a revised amount, the Architect will promptly issue a Certificate for payment for the amount for which the Architect is able to make such representations to the Owner.* The Architect may also decide not to certify payment or, because of subsequently discovered evidence or subsequent observations, may nullify the whole or a part of a Certificate for Payment previously issued, to such extent as may be necessary in the Architect's opinion to protect the Owner from loss because of:

 **.1** *defective Work not remedied;*

 **.2** third party claims filed or reasonable evidence indicating the probable filing of such claims;

.3 *failure of the Contractor to make payments properly to Subcontractors or for labor, materials or equipment;*

.4 *reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum;*

.5 damage to the Owner or another contractor;

.6 reasonable evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay; or

.7 *persistent failure to carry out the work in accordance with the Contract documents.*

\* \* \*

### 9.6 PROGRESS PAYMENTS

**9.6.1** *After the Architect has issued a Certificate for Payment, the Owner shall make payment* in the manner and within the time provided in the Contract Documents....

**9.6.2** The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled....

\* \* \*

### 9.7 FAILURE OF PAYMENT

**9.7.1** *If the Architect does not issue a Certificate for Payment through no fault of the Contractor,* within seven days after receipt of the Contractor's Application for Payment ... then *the contractor may, upon seven additional days' written notice to the Owner and Architect, stop the Work until payment of the amount owing has been received ....*

(Exhs. 1 and 81, emphasis added.)

The HUD General Conditions provide that:

**4. Architect's Duties and Responsibilities** ...

e. *Review and make recommendations with respect to the PHA payment of* progress payment requisitions made by the Contractor.

\* \* \*

**6. Schedule of Amounts for Contract Payments** ...

c. *In order to receive progress payments as the work progresses, the Contractor shall submit to the Architect,* on forms supplied by the PHA, *periodic estimates* showing the value of the work performed during each period based upon the items appearing in the approved breakdown. Such estimates must be submitted not later than 10 days in advance of the date set for payment, and are subject to correction and revision as required. *In final form, they must bear the certification of both the architect and the PHA before any payment may be made.*

\* \* \*

**8. Payments to contractor**

a. Progress payments will be made at approximately 30 day intervals....

(Exhs. 1 and 81, emphasis added.)

The General Requirements provide:

*SECTION 01741—Method of Payment*

1.01 Partial payments will be made as the work progresses not later than fifteen (15) days after the 25th day of each calendar month for work done, materials installed or materials delivered to the site during the preceding fiscal month on *estimates certified or approved by the Owner.*

(Exhs. 1 and 81, emphasis added.)

The general practice of the Capolino firm and the Authority regarding payment was as follows: the Capolino firm prepared payment applications several days before the end of the month, requesting payment for the amount of work it projected would be completed by the end of the month. (Cap., 70.) These applications were submitted to the Architect (Arnold) for certification, and a copy was given to Galli. Once the applications were certified by Arnold, Galli prepared a report that he presented to the Authority's Board of Commissioners at the Board's regular meeting, held on the second Tuesday of

every month.[5] (Cap., 87.) The Authority and Architect generally held a job meeting during the days preceding the submission of a payment requisition to the Board, so that concerns about the contractor's work and his payment requisition could be considered and the requisition revised in time for submission to the Board at its upcoming meeting. (Arnold, 281.) Once the Board approved an application, it would then be sent to HUD, who would provide the money to the Authority. The Capolino firm was generally paid approximately 5 weeks after it submitted an application. (Cap., 84, 87–88.)

## II. THE CONFLICT AT WINBROOK

On or about February 20, 1992 the Capolino firm delivered a set of values on Winbrook to the Authority and to the Architect, which was approved. (Stip.# 13.) Pursuant to a written Notice to Proceed, March 2, 1992 was prescribed as the starting date for the Winbrook Contract, and March 1, 1993 was prescribed as the scheduled completion date. (Exh. 7.)

The Authority paid the Capolino firm's first five applications for payment, which included work through July 31, 1992, totaling $249,634.35.[6] (Stip.# 16.) It withheld a 5% retainage, that by July 31 totaled $13,138.65. Thus, by the end of July, the Capolino firm had been paid for approximately 81% of the work, with another 4% held in retainage.[7] Galli issued a "Construction Update" dated August 4, 1992, which stated that all of the Winbrook work had been completed except for the fire alarm activation, which was to be completed by September. (Exh. 48.) The

Capolino firm's July application included $17,500 for work on the vacuum pumps and $7,500 for work on the heat timers. These amounts were paid. (Exh. A16.)

In its August application, the Capolino firm requested payment for $30,000 worth of work, including the remainder of the budget for the vacuum pumps and the heat timers ($1,000 for each). Naber Thomas was Capolino's subcontractor for heat timers; National Heating was its subcontractor for the vacuum pumps. A job meeting was held on August 21, where Dalton asked for verification that the heat timer system was operational. (Exh. 14 (Arnold Mtg. Minutes).) On August 25, Arnold approved the requisition. (Cap., 69; Arnold, 282–283; Exh. 26.) He stated that at that time, he fully believed everything had been done, but that it became apparent later that more work was required. (Arnold, 286.) A second "Mechanical Meeting" was held on August 26th, however, at which Dalton raised concerns that the work on the heat timers and vacuum pumps was not complete according to the specifications. (Exh. 16 (Dalton Mtg. Notes).)

Section 15500 of the specifications describes the work to be done on the heat timers and vacuum pumps as follows:

1.02 DESCRIPTION OF WORK

A. ...

\* \* \*

C. ...

1. Replace existing heat timer systems in all buildings with new heat timer systems complete with associated valving traps, piping, wiring, controls, etc., com-

5. Galli testified that he received the Contractor's and the Architect's payment applications, reviewed them, and submitted them to the Board for approval. He stated that he reviewed the applications for form, but that it was the architect's responsibility to review the contractor's requisitions to determine whether dollars were spent "wisely." However, he regularly prepared a letter he characterized as a "form" letter that stated "I have reviewed the attached invoice submitted by [contractor] ... The amounts submitted coincide with the contract percentage completion and therefore are acceptable." (Galli, 494–95; Exhs. 54–55.)

6. These payments were: (# 1) $25,671.85 through 2/19/92 paid on 3/24/92 (this figure is

incorrect in the Stipulation—see Exh. A12); (# 2) $37,762.50 through 4/30/92 paid on 5/29; (# 3) $23,750 through 5/29/92 paid on 7/1; (# 4) $106,400 through 6/30/92 paid on 7/27; (# 5) $56,050 through 7/31/92 paid on 9/9. (Stip. # 16; Exhs. A12–A17.)

7. These numbers are not exact, because the payment forms apparently do not account for the $1,219 Change Order Number One, and thus list the total contract price to be $308,773, not $309,992. This $1,219 worth of work is not in dispute, and we assume it was completed. However, in calculating the percent completion we have used $308,773 as the contract price.

plete and fully tested. Engage the services of a factory trained representative of heat timers for two (2) days to start up and calibrate each system.

\* \* \*

3. Rebuild each vacuum pump with new components of size, type, etc., as recommended by the pump manufacturer, and put in full working order under the supervision of the pump manufacturer. Test each pump and put it in full operation. Replace valves, etc., at each pump.

Section 15520 provides as follows:

3.05 TESTING

A. Perform all required tests to ensure proper operation of the entire heat timer control system including the control valve and actuator. Adjust or replace, as required, all components, devices, etc, and leave each system in a complete and fully operating condition.

(Exh. 1.)

The Winbrook drawings clearly indicate that the steam control valve is to remain. It is labeled in the drawings: "HONEYWELL AUTOMATIC ZONE CONTROL VALVE (STEAM) TO REMAIN." in addition, the drawing "NOTES" state, in relevant part:

3. Provide new heat timer and all associated auxiliaries complete, including wiring panel, etc., *to tie into existing automatic steam control valve.* Disconnect and remove existing heat time controls and auxiliaries complete. See specifications for added information.

(Exh. 1A (Cap.), emphasis added.)

Despite the drawings, Dalton took the position at the Mechanical Meeting that the contract with Capolino included work on the steam control valves and actuators under ¶ 3.05–A. (Exh. 16.) This assertion was apparently based in part on an August 14th letter to Arnold written by Bob Pockl, the Authority's Superintendent of Maintenance, stating that no work had been done on the steam control valves and that in their present condition they were "totally useless." (Exh. 18.) Pockl asserted that Capolino was required under the contract to "remove disassemble, repack generally overhaul the entire

valve assembly, and reinstall valve, replace all Honeywell modulating motors ..." in order to "bring the heat timers up to operating specs." (*Id.*) The Capolino firm, represented by Laura Villani, took the position that work on the steam control valves and actuators was not included in the contract. (Exh. 16.) Capolino's subcontractor for the heat timers, Naber Thomas, reported that its work was finished and Capolino's subcontractor for the vacuum pumps, National Heating, stated that their contract with Capolino did not include work on the steam control valves and actuators. (*Id.*)

Regarding the vacuum pumps, Dalton stated he believed the manufacturer had not been contacted for recommendations regarding rebuilding the pumps, and that all (gate and check) valves had not been replaced as per Section 15500 ¶ 1.02C. (*Id.*) This position was likely based upon Pockl's August 14th letter, in which Pockl stated that while National Heating had allegedly replaced the pump seals, he found the replacement "questionable" and would only be satisfied by watching it being done. (Exh. 18.) Pockl asserted that the work on the vacuum pumps was incomplete and failed to comply with the specs, and listed numerous actions he believed Capolino was obligated to take in order to comply, including pulling the floats and controls for inspection and replacement as needed with new gasket material, flushing the tanks, pulling the pumps and installing Sarco seal kits, replacing all system check valves and gate valves, etc. (*Id.*) National Heating stated that it was the manufacturer's representative and that it had examined the vacuum pumps and replaced those parts it felt necessary. However, it reported that it replaced check and gate valves in only two locations and that all other such valves were in satisfactory condition. (Exh. 16.)

In approximately November, the Authority learned that when Capolino had sent National Heating Section 15500 ¶ 1.02C of the specifications seeking a bid for the vacuum pump work, Capolino had circled "Replace valves etc., at each pump" and had written "ONLY IF NEEDED." (Exh. 10 (July 16 fax from Capolino to National Heating inclosing specifications); Exh. A29 (November 20 letter

from National Heating to Capolino stating it still did not have the specifications at issue).) Thus, although National Heating had agreed to replace the vacuum pump valves on an "as needed" basis, unbeknownst to it, the contract required them all to be replaced. In addition, the possibility of a two-year warranty for the vacuum pumps was raised at the meeting.[8]

On August 26, Dalton wrote a letter to Arnold stating that:

> The work required to be performed for the Heat Timer and Vacuum Pump installations has not yet been completed and is not acceptable in its unfinished state. The Contractor must demonstrate to the satisfaction of th [sic] Owner that the entire installations will be completed and comply with the contract documents, prior to approval for payment.

(Exh. 17.) On August 27, Arnold forwarded this letter to Capolino and informed him that if the work was not corrected by September 4, his application for payment could not be processed as submitted. (*Id.*) In response to the disagreement and in order to facilitate payment of undisputed work, Mr. Capolino agreed that the Authority could withhold the $1,000 he had requested for heat timers, as well as the $1,000 for vacuum pumps. (Cap., 75–77; Exh. 20.) Arnold certified the adjusted application and the Authority accordingly paid the Capolino firm $26,500 for the month of August ($28,500 − $2,000), instead of paying the $28,500 it had initially requested ($30,000 × 0.95 = $28,500).[9] (*See* Exh. A17.) This brought the total amount paid to the Capolino firm to $276,134.35, or approximately 89%, plus approximately $14,638 or 5% of retainage, for a total amount completed of roughly 94%. Arnold based his own August 25, 1992 request for payment of architect's fees on 95% completion of Winbrook. (Exh. 55.) Galli wrote a "Construc-

tion Update" dated August 31, 1992 that stated that work at Winbrook was complete and "in the punch list stage" except for fire alarm activation and a dispute over the "validity of the completeness" of the heat timers and the vacuum pumps and that Galli reserved the right to pull $2,000 from the Capolino firm's requisition if the work is not complete. (Exh. 49.)

On approximately September 24, 1992, Capolino submitted Application for Payment # 7 to Arnold, requesting payment for $16,-719 worth of work completed during September ($15,883.05 after retainage). (Exh. A18.) This amount included $15,000 for electrical work (on the fire alarms), $500 for clean up/punch list and $1,219 for "Vacuum Pumps—cold water make ups." On September 30, Arnold rejected the application and returned it for corrections, writing "not appvd. overstated amts". (Exh. 27.) Although Capolino had not presented a claim payment for the $2,000 previously withheld on the vacuum pumps and heat timers, Arnold circled these two categories, as well as the $15,000 for the electrical and wrote "no response to our 8/27/92 letter, work not $100%". He also circled the $500 for clean up/punch list and wrote "too little to finish." Arnold made no notations on the $1,219 requested for cold water make ups. (*Id.*) There was no job meeting held in September. (Cap., 452.) On September 30, Galli wrote a construction update that stated "We are withholding payment from Capolino, who is notorious for not completing the final stages of work in a timely fashion." (Exh. 108.) Galli testified at trial, however, that he had no knowledge about the reputation of the Capolino firm, and that the sole basis of his statement was their work on the two Authority contracts. (Galli, 531.) On October 1, Arnold again submitted a request for pay-

---

8. Dalton's narrative of the August 26th meeting states that National Heating proposed increasing the warranty on the vacuum pumps from one to two years. (Exh. 15); Arnold's notes state that Galli requested information on a two-year warranty before he would decide whether to accept the vacuum pump certifications. (Exh. 16.)

9. This method of withholding the $2,000 was unusual. Instead of subtracting $2,000 from the

$30,000 worth of work for which Capolino had requested payment and then withholding retainage ($28,000 × 0.95 = $26,600), the Authority apparently calculated the payment as if $30,000 worth of work had been completed ($30,000 × 0.95 = $28,500) and merely subtracted $2000 from that number. This method resulted in Capolino being paid $26,500, $100 less than under the usual method.

ment of architect's fees based on 95% completion of Winbrook. (Exh. 56.)

During this same period, conflicts were surfacing under the Schuyler contract as well, particularly with regard to 26 windows the Capolino firm had contracted to install there. Mr. Capolino requested a job meeting to discuss the problems on both projects, and the parties met October 9. In order to understand the interactions between the parties from that point on, we must now review the nature of the conflict at Schuyler.

### III. THE CONFLICT AT SCHUYLER

On or about May 11, 1992, the Capolino firm delivered a set of values to the Authority and to the Architect for the Schuyler project, which were approved. (Stip.# 23.) Pursuant to a written Notice to Proceed, May 12, 1992 was prescribed as the starting date for the Schuyler contract, and May 11, 1993 was prescribed as the completion date. (Exh. 81.) On May 11, Capolino submitted an overall job schedule to the Authority, providing that the demolition of the window wall would occur in late May, and that the work on the windows would begin in mid July and be completed by early September. (Exh. 82.) On approximately June 26, Capolino submitted a revised job schedule to Arnold, which stated that the demolition of the window wall was done, but that work on the windows and wire guards would not begin until the end of September and would not be completed until May of 1993. (Exh. 83.) Arnold testified that he and Tascione were unhappy that the original schedule providing that the windows would be in by the end of September had been modified to May after the demolition of the window walls had occurred because they had allowed the demolition of the window walls in May based upon the assurance they would be in by the fall. (Arnold, 318.) The area was to be used as a day care center, and though they acknowledged that Capolino had the right under the

contract to take until May to install the windows, (id. at 885, see also Tasc., 805), the space would be unusable without some sort of windows. Lack of windows was not the only issue preventing use of the day care center, however. Another contractor, ERA Corporation ("ERA"), had demolished the area and then defaulted, requiring their surety to step in. (See Exh. 101; Cap., 246; Tasc., 659.) [10]

The Authority paid the Capolino firm's first four applications for payment under the Schuyler contract, which included work through August 31, 1992, totaling $169,-615.85.[11] It kept a 5% retainage that by August 31 totaled $8,927.15. (Exh. A26.) Thus, by the end of August, the Capolino firm had billed and was eventually paid for approximately 72% of the work under the contract, with another 4% held in retainage. On or about September 24, 1992, the Capolino firm submitted to Arnold a proposed Schuyler Application and Certificate for Payment # 5 requesting payment for $25,900 worth of work ($24,605 after retainage). (Stip. # 25; Exh. 85.) On September 30, Arnold returned the application for corrections. (Exh. 85.) On the first (summary) page he circled the $24,605.00 total and wrote "not approved, overstated amts." On the second (detail) page he circled the $1,000 requested for Submittals and wrote "not 100%." Capolino had requested $1,600 for General Conditions, and Arnold circled the $1,400 balance to finish and wrote "too little to finish." Lastly, Arnold circled the $15,000 Capolino requested for the Windows and Wire Guards and wrote "41% of Windows in place?" (Id.) He made no notations regarding the $1,500 requested for Hollow Metal/Hardware, the $5,300 requested for ceramic tile, the $500 requested for Acoustical tile, or the $1,000 requested for Painting. (Id.)

At the time there were in fact no windows

---

**10.** On February 2, 1993, Tascione wrote a letter to Ainars Rodins, Director of Management of the Office of Public Housing at HUD stating that "While it is true that the day care construction project has been delayed, it is due solely to the default of the original contractor, E.R.A. Development Corporation." (Exh. 101.)

**11.** These payments were: (1) $40,890.85 through 5/29/92 paid on 6/26; (# 2) $42,465 through 6/30/92 paid on 7/27; (# 3) $27,360 through 7/31/92 paid on 9/9; and (# 4) $58,900 through 8/31/92 paid on 10/7. (Stip. # 24; Exhs. A23–A26.)

in place.[12] With regard to the windows, the specifications state:

SECTION 08500—ALUMINUM WINDOWS

1. GENERAL

1.02 Quality Control

a. For purposes of designating type and quality for work of this Section, drawings and specifications are based upon products of EFCO Corporation. Whenever substitute products are to be considered, supporting technical literature, samples and drawings must be submitted in order to make a valid comparison of the products involved.

(Exh. 81.) Capolino had made five submissions to the Architect between June 25th and September 29th in an attempt to get Arnold's approval for an asserted equivalent to the windows provided in the specifications. The General Requirements set the guidelines for the use of equivalent materials as follows:

Section 01740—Non–Restrictive Clause

Whenever a material, article or piece of equipment is identified on the plans or in the specifications by reference to manufacturers' or vendors' names, tradenames, catalogue numbers, etc., it is intended to establish a standard; and, *any material article, or equipment of other manufacturers and vendors which will perform adequately the duties imposed by the general design will be considered equally acceptable provided the material, article or equipment so proposed, is, in the opinion of the Architect, of equal substance and function. It shall not be purchased or installed by the contractor without the written approval of the Architect and the Owner.*

(Exh. 81, emphasis added.)

Gismondi and Arnold rejected all five of Capolino's submissions as not equivalent. At trial, Arnold testified that Capolino did not submit the required detailed drawings or samples on any of the five window submissions. (Arnold, 317, 883.) Moreover, none of the windows that Capolino submitted were in fact equivalent. Gismondi and Arnold returned Capolino's June 25 submission of an Eckert "Thermalux" window to him on July 2 with a circle around the description of the window as "prime finish" and a stamp initialed "GM" [13] that stated "submit specified item." (Exh. A102.) The specifications required a dark bronze anodized finish. (Exhs.88A, A99.) On July 22, Capolino submitted another Eckert window and on July 24 "GM" again stamped it "submit specified item" and wrote: "Submit project-out windows. Submit complete installation details. Submit double tilt windows. Submit specified finish. Submit glass U-value." (Exh. A103.) This window also was not dark bronze anodized finish, nor was it double tilt as the specifications required, and there was no information given for numerous other specifications. (Id.; Exh. A99.) On July 29, Capolino submitted information on a Champion 2500 window. Markel returned the information on August 6, writing: "spiral balance not permitted. Sill thickness. 1″ insulated glass. U-values? Quality assurances." (Exh. A104.) Although the specifications required 1″ glass and a block-and-tackle balance type, the Champion 2500 had 7/8″ glass and was spiral balanced. In addition, the submission contained no information on glass U-value. (Id.; Exh. A99.) On August 31, Capolino submitted a Champion 1000 window which Markel rejected the same day, writing on the cover sheet "air infiltration", "U-value" and "Anodized finish." (Exh. A105.) The Champion 1000 in fact did not satisfy the air infiltration and finish specifications, and the submission included no information on the glass U-value.[14] (Id.; Exh. A99.) Lastly, on

---

12. The Authority paid Cali Brothers $5,200 to install 26 temporary windows sometime between February and May of 1993. (Exh. A80.)

13. The submissions were sent to the attention of Gerry Markel at Gismondi and Arnold. Arnold testified that it was Markel who prepared Exh. A99, under his supervision. (Arnold, 299, 874.)

14. The specification for the 2500 did include information on an overall U-value (illegible—.59 or .69). There was considerable discussion at trial as to whether Arnold was erroneously requiring Capolino to meet a 0.42 overall U-value, a specification likely impossible to meet. Arnold at one point testified that the U-value required by the specifications was for the overall window assembly, (Arnold, 310), and he may well have

September 29, Capolino submitted information on a Kawneer window, that was returned October 5, marked "double tilt." [15] (Exh. A106.) In addition to being single tilt, the submission included no information on glass U-value. (Exh. A99.) Thus, when the September payment application was rejected, there were no windows in place and none had been approved. However, Capolino had paid approximately $12,430 for sills, window guards and other materials. (Exh. 87.)

The day after submitting his payment requisition, Capolino submitted a request for a Change Order for increased cost incurred for substituting plumbing contractors. (Exh. 84.) The Capolino firm had based its Schuyler bid in part on an estimate supplied by B & L Plumbing. However, the authority subsequently disapproved of B & L because B & L was in litigation with the Authority. (*Id.*, 6/11/92 Letter from Galli to Capolino.) Capolino quickly sent the Authority a revised subcontractor list, and on June 16, Galli sent a letter approving the list including "Bruni [sic] and Campisi" as the plumbing contractor. (Exh. 84.) Capolino's September 25 letter requested an additional $5,865 to cover the higher cost of Bruno and Campisi pursuant to A.I.A. General Conditions ¶ 5.2.3.[16]

This was a 76% increase above B & L's bid. (*Id.*) On October 6 Arnold wrote a letter rejecting this request, stating that "such a claim for additional funds requested after the work has been performed and with no prior notification to the owner cannot be accepted." (Exh. 84.) Capolino testified at trial that although he had told the Authority verbally that the cost would be more, he had not written the increase down until his September 25 request for a change order. (Cap., 190–193.) His October 5th letter response to Arnold also states that he told the Authority Bruno and Campisi would be more expensive. (Exh. 84.) Arnold wrote back on the 6th telling Capolino to refer to (A.I.A. General Conditions) ¶ 4.3.7. Claims for Additional Cost for the proper procedure for requesting a claim for increased work. (*Id.*) This procedure requires written notice prior to performing the work.[17] Capolino responded on October 8, stating that ¶ 5.2.3 applied, not ¶ 4.3.7. (Exh. 84.)

These disputes regarding the windows, the plumbing change order and payment of Capolino's September payment application for Schuyler were raised at the October 9 meeting, along with the issues on Winbrook.

had this erroneous interpretation of the specifications during the period Capolino was submitting proposed equals. (Arnold later realized his error, *Id.* at 314.) However, all five of the windows submitted by Capolino failed to meet specifications other than the one for U-value, thus this possible error on the part of Arnold, though unfortunate, is not controlling here on the question of whether the windows were indeed equals. We note, however, that this error may have been limited to Arnold's testimony at trial—Markel apparently sought the glass U-value as early as July 24 when he rejected the second Eckert submission. (See Exh. A103.)

**15.** "Double tilt" is important to facilitate cleaning.

**16.** Paragraph 5.2.3 provides:

**SUBCONTRACTORS**
5.2 AWARD OF SUBCONTRACTS AND OTHER CONTRACTS FOR PORTIONS OF THE WORK
5.2.1 . . . .

\*　　\*　　\*

5.2.3 *If the Owner or Architect has reasonable objection to a person or entity proposed by the Contractor, the Contractor shall propose another to whom the Owner or Architect has no reason-*

*able objection. The Contract Sum shall be increased or decreased by the difference in cost occasioned by such change* and an appropriate Change Order shall be issued. However, no increase in the Contract Sum shall be allowed for such change unless the Contractor has acted promptly and responsively in submitting names as required.
(Exh. 81.)

**17.** A.I.A. ¶ 4.3.7 states in relevant part:

**4.3 CLAIMS AND DISPUTES**
**4.3.7 Claims for Additional Cost.** If the Contractor wishes to make Claim for an increase in the Contract Sum, *written notice as provided herein shall be given before proceeding to execute the Work* . . . . If the Contractor believes additional cost is involved for reasons including but not limited to (1) written interpretation from the Architect, (2) an order by the Owner to stop the Work where the Contractor was not at fault, (3) a written order for a minor change in the Work issued by the Architect, (4) failure of payment by the Owner, (5) termination of the Contract by the Owner, (6) Owner's suspension or (7) other reasonable grounds, Claim shall be filed in accordance with the procedure established herein.
(Exh. 81.)

## IV. CONFLICTS INVOLVING BOTH CONTRACTS

Capolino testified that after Arnold rejected the Winbrook payment application, he tried to contact Arnold, but could not reach him. (Cap., 98.) He described the relationship between his firm and the Authority as entering "the twilight zone" and alleged that his calls were not returned and that he received letters threatening to throw him off the job and debar him. (*Id.*, 1157–58.) On October 9, Capolino, Arnold and Galli met in an attempt to resolve the problems regarding certification of Capolino's September payment applications. Capolino testified he was anxious to have the applications certified immediately, in time to be sent to the next Board meeting for approval. (Cap., 100.) He added that he wanted to discuss payment of the Winbrook requisition, but that the others refused and insisted on discussing work on the steam control valves. (*Id.*) According to Dalton's meeting notes, Capolino proposed $15,000 for extra work on the heat timers, and Galli told him this was excessive and suggested he secure further quotations, which Capolino agreed to do. (Exh. 30.) Dalton also states that although National Heating offered to extend the warranty to two years, Capolino refused. (*Id.*)

At the October 9 meeting, Capolino also requested that his September application for Schuyler be approved. He testified that Arnold and Galli refused to consider payment for the undisputed work and that Arnold told him "just give me the goddamn window I want." (*Id.*, 108–110.) Capolino then told the others that Mr. Tascione, as Contracting Officer, should be at the meeting, and when Galli and Arnold said Tascione was not available, Capolino left. (*Id.*) Arnold's meeting notes state that Capolino refused to remain to discuss submission of correct shop drawings for the windows, the request for additional funds to use an alternate plumbing contractor, the status of the job and the rejected application for payment, and that while Galli, Dalton and Arnold wanted to remain to continue discussion, Capolino stated he preferred to have his attorneys respond. (Exh. 88.)

After the October 9 meeting, several volleys of letters passed back and forth between Capolino and the Authority. On October 9, Capolino wrote a letter to Tascione informing him that he had left the meeting earlier that day, and that several conflicts existed between his firm and Arnold, Dalton and Galli over the scope of work required by contract on both Winbrook and Schuyler. (Exh. 33.) Capolino set forth his position on the various disputes, ranging from the rejected window submissions and outstanding plumbing change order at Schuyler to the two-year warranty discussed for the vacuum pumps and the work on the steam control valves, and requested a decision from Tascione as the Contracting Officer, pursuant to the HUD General Conditions. (*Id.*)[18] He stated that he was enclosing updated payment applications and he requested a meeting to go over the issues, or in the alternative, a change order under HUD ¶ 9 that would allow him to go ahead with the work and apply for equitable adjustment. (*Id.*)

Capolino modified the updated Schuyler payment application he sent Tascione to include work through October 9, but did not reduce the amounts requested for any items Arnold had questioned on the September application. (Exh. A27.) The updated application did break down the $15,000 requested for Windows as $13,000 for Wire Guards and $2,000 for Sills. The only other changes in the submission were an addition of $200 for work allegedly completed on Resilient Tile, $1,500 for Painting, and $8,856 for Plumbing. (This included the $5,865 Capolino requested to substitute Bruno & Campisi). (*Id.*) On October 14, Arnold sent Capolino a letter referring him to his original schedule for replacing the windows, asserting that his fail-

---

**18.** Regarding disputes, the HUD General Conditions provide:

**14. Disputes**

a . . . . *all disputes* arising under or relating to this contract, including any claims for damages for the alleged breach thereof which are not disposed of by agreement, *shall be present-ed in writing to the Contracting Officer; the Contracting Officer shall, with reasonable promptness, after obtaining the approval of HUD, render his/her decision to the contractor in writing.*

(Exhs. 1 and 81, emphasis added.)

ure to install windows or temporary coverings has resulted in a delay in opening the day care center, and that he awaited a conforming window submission. (Exh. 89.) Capolino responded on October 15th by stating that he was entitled to revise the schedule, that any demand that he complete the windows earlier was an acceleration requiring a Change Order under HUD ¶ 9(a)(4) and that he had no problems complying with any "legitimate" request of the Contracting Officer, as the Contract required. (*Id.*) On October 16, Tascione sent Capolino a letter stating his October 9 request simply repeated his September request, which was overstated according to Arnold. He noted that the Change Order (for plumbing) had previously been disapproved. (*Id.*)

On October 19, Capolino sent Tascione another letter requesting that Tascione approve the Schuyler payment application, per Section 01741 ¶ 1.01 of the General Requirements (stating that the "Owner" approves payment) and that they meet to try to resolve the issues. (Exh. 90.) On October 29, Tascione sent Capolino a letter directing him to correct within seven days the deficiency caused by his removal of the windows and subsequent failure to submit conforming windows or to install temporary windows. (Exh. 92.) Capolino responded the same day, stating that the windows had security screens and a "double wall with exterior sheathing"

in accordance with General Requirements Section 02000 ¶ 3.3. (*Id.*) On October 30th, Galli sent Capolino a letter stating that ¶ 3.03(c) required at least 3/4" plywood,[19] that there had been leakage problems, and that Capolino had caused delays in the day care center by demolishing under one schedule and installing under another. (*Id.*) Capolino wrote Tascione on November 3rd, asserting that Galli had no authority to order any work be done and requesting that Galli inform him of a window that would be an equal. (*Id.*)

On November 6, Capolino sent a letter notice of default under A.I.A. ¶ 14.1.1.3 on the Schuyler contract to Tascione stating that the Capolino firm considers the Authority to "be in breach of its contractual obligations by not approving and processing a valid request for payment and furthermore by not making partial payments every 30 days. Please refer to A.I.A. 9.4.1 and HUD 6c and 8a." (Exh. 95.)[20] The letter asserted that the Authority had breached its obligation to accept equals for the windows, "by utilizing a specification written by one manufacturer without ranges in requirements and then strictly adhering to each picky item, thereby rendering no windows as equal." (*Id.*) On November 9, Tascione sent a response stating that he supported Arnold's position that the five window submissions were not equals, and that the failure to in-

---

19. General Requirements Section 02000 ¶ 3.02(c) (Demolition) states that contractor "shall be responsible for the protection of the existing building and adjacent areas." Paragraph 3.03(c) (Protection) requires that at least 3/4" plywood be used. (Exh. 81.)

20. A.I.A. ¶ 14 provides, in relevant part:

**TERMINATION OR SUSPENSION OF THE CONTRACT**

**14.1** TERMINATION BY THE CONTRACTOR

**14.1.1** The Contractor may terminate the Contract if the Work is stopped for a period of 30 days through no act or fault of the Contractor or a Subcontractor ... for any of the following reasons:

\* \* \*

.3 because the Architect has not issued a Certificate for Payment and has not notified the Contractor of the reason for withholding certification as provided in Subparagraph 9.4.1....

\* \* \*

**14.1.2** If one of the above reasons exists, the Contractor may, upon seven additional days'

written notice to the Owner and Architect, terminate the Contract and recover from the Owner payment for Work executed and for proven loss with respect to materials, equipment, tools and construction equipment and machinery, including reasonable overhead, profit and damages.

**14.1.3** If the Work is stopped for a period of 60 days through no act or fault of the Contractor or a Subcontractor or their agents or employees or any other persons performing portions of the Work under contract with the Contractor because the Owner has persistently failed to fulfill the Owner's obligations under the Contract documents with respect to matters important to the progress of the Work, the Contractor may, upon seven additional days' written notice to the Owner and the Architect, terminate the Contract and recover from the Owner as provided in Subparagraph 14.1.2. (Exhs. 1 and 81.)

stall windows was causing hardship to the day care center. (Exh. A74.) He concluded by stating that the Authority "expects your firm to perform all aspects of your contract in accordance with the specifications, not in accordance with your desires." (*Id.*) On November 13, Capolino sent Tascione another letter, stating that the Authority had failed to cure its default, that the letter constituted the seven additional days notice provided by A.I.A. ¶ 14.1.2, and that his firm requested the contract balance and damages. (Exh. A33.) The same day, Arnold sent Capolino a punch list of work to be completed in the men's and women's bathrooms. (Exh. 93.) On November 17, Capolino sent a letter stating that the punch list must have crossed in the mail with their termination notice, but promising to finish most of the items on the punch list. (*Id.*)

After the October 9 meeting, Capolino also sent Tascione a payment application for Winbrook. The application was identical to the one he sent Arnold in September, simply re-dated October 9. (Exh. A22.) On October 22, Dalton made a second site visit to Winbrook and sent Capolino a field report stating that a new interior sensor should have been installed, but was not, that no work on the steam control valves and actuator had been done as required by ¶ 305–A, and that the contractor "must demonstrate proper operation of steam control valves in all buildings to the Owner's satisfaction. This must be done without delay as the heating season has now started." (Exh. 36.) On November 2, Dalton again sent Capolino a copy of the field report, and asked "When will this work be completed?" (Exh. A28.)

In his November 9 letter to Capolino, Tascione informed him that he concurred with Arnold's position regarding a change order for Winbrook and that National Heating's bid had not included all of the work on the vacuum pumps because Capolino had not properly given them the specifications. (Exh. A74.) As discussed above, the letter concludes with an instruction to "perform all aspects of the contract in accordance with the specifications." (*Id.*) On November 12, Capolino sent a notice of default on the Winbrook Contract to Tascione. Using language

identical to that of the Schuyler letter, he informed Tascione that the Capolino firm considered the Authority to be in breach for failure to approve and pay payment requisitions. (Exh. A35.) On November 19, Capolino sent a second letter, stating that "pursuant to A.I.A. ¶ 14.1.2 we hereby give you the seven additional days notice and consider our contract terminated" and demanding damages. (Exh. A36.)

On November 23, Tascione wrote two essentially identical letters to Capolino (one for Schuyler and one for Winbrook) informing him that the Authority was considering holding his firm in default because he had failed to return numerous calls by Arnold and Galli, and because he had failed to address concerns with:

(1) Lack of contractor or subcontractor presence;

(2) Failure to adhere to approved schedule;

(3) Failure to complete work in accordance with plans and specifications;

(4) Failure to proceed with punch list items in accordance with inspection reports as devised by the Architect/Engineer.

(Exhs. 60, 96.) Tascione sent a copy of this letter to General hoping it would step in. (Tasc., 691.)

Capolino wrote a letter in response regarding Schuyler on November 25. He stated that the punch list was complete, that as Contracting Officer Tascione had an obligation to respond to his requests for clarifications, change orders, etc., and that his firm still had enough time to complete work under the project, had the Authority not defaulted. He concluded by requesting a meeting. (Exh. A34.)

On November 30, Capolino sent two letters (one for each contract), informing Tascione that he considered the Winbrook and Schuyler contracts terminated by prior notice and requesting payment of the full contract sum on each. ($33,757.65 for Winbrook and $65,-384.15 for Schuyler). (Exhs. A37 and A38.) Both letters stated that he still awaited scheduling of "the meeting we requested and you acknowledged." (*Id.*) Galli's Project Construction Status chart dated November

30 listed Capolino's work at Winbrook as "100%" complete. The letter portion, however, stated that while the work was "substantially completed" there remained a dispute over the heat timers and vacuum pumps and that all payments to Capolino had ceased. (Exh. 51.) His Construction Update Status Chart stated that Schuyler was 92% complete, but the letter portion stated the day care center was still pending due to ERA's fault and the still pending approval of the window shop drawings. (*Id.*)

On December 9, Capolino reiterated that he had terminated both contracts as per HUD ¶ 14.1.1.3. (Exh. 65.) On December 15th, Tascione sent two letters to Capolino (one for each contract), informing him that although it had requested specific performance on November 23rd, Capolino had not performed and that the Authority was therefore terminating the contracts upon the expiration of seven days notice. (Exhs. A78 and A79.) Tascione also sent letters to General, informing them of the default and pending termination, and requesting that General contact them to discuss the options under their bond. (*Id.*)

On December 16, Galli sent HUD a letter requesting an extension of time under the Winbrook CIAP, apparently from March of 1993 to September 1993, because of the delays it has incurred in reaching an amicable settlement with the Capolino firm as a result of the "timely termination" of Capolino's contract. (Exh. 114.) Although no litigation had yet been filed, on March 1, Galli wrote a second letter to HUD stating that the extension was necessary due to the "existing and time consuming litigation" with the Capolino

firm. He concluded that the matter was still under investigation and will probably create additional delays for the Authority. (Exh. 115.)

At trial, Arnold testified that the Capolino firm or its subcontractors appeared and did miscellaneous work on both projects in November, December, January and into February. (Arnold, 302.) [21] Capolino argues that Galli's Project Construction Status charts show that he was completing the jobs. (For example, Galli's November 30th report includes a chart that lists Winbrook as 100% complete. However, the chart is in conflict with the text of the report that notes outstanding issues on the "validity of completeness" of the heat timers and vacuum pumps. (Exh. 51).) We do not consider Galli's Project Construction Status charts to be a reliable indication of the work done at the projects. Even though Galli's job may have been to offer a substantive evaluation of the status of completion of the projects, Galli testified that he simply relied upon the percentage completion that Capolino submitted in his applications! (*See* n. 5, *supra.*) Thus, the best evidence of what work was being done are the letters detailed above.

On January 7, 1993, all three parties met to discuss settlement of the claims. Capolino was represented by counsel and did not personally attend, apparently at Tascione's request. A tentative settlement proposal was discussed whereby both parties would rescind their notices of default, General would complete the contracts and be paid the remainder, and would pay any monies owed to Capolino. (Exh. 71 (Brackenbury Meeting Notes (General's representative)).) A final

---

**21.** The punch-list items accomplished at Winbrook were as follows: on December 17, Capolino received a letter from Naber Thomas stating that they had tried to schedule a substantial completion walk-through, but the Authority had refused stating that only the contractor could schedule such an inspection (exh. 128; Cap., 1140); on December 17, Capolino also received a punch list from Arnold asking him to fix a hollow metal door frame that had been detached from the wall. He responded by fixing the door and reiterating that the contracts were terminated (exh. 70); on February 4, National Heating did 3 or 4 hours of work on the vacuum pumps (exh. 128; Cap., 1140); on February 18, Naber Thomas sent Capolino a letter stating that there

had been sporadic problems with the intercom system and that they had fixed them as recently as February 4. (Exh. 106.) During this period Capolino testified he made six calls to various Authority employees. (Cap.1143–44.)

The punch list items accomplished at Schuyler were as follows: on November 6, Arnold sent Capolino a letter from Galli telling him saddles at Schuyler were causing a tripping hazard, Capolino testified the subcontractor fixed it within 2 or 3 days (exh. 128; Cap., 1140); on November 25, Capolino sent Tascione a letter stating that the Architect's 11/13 punch list "was completed last week and some people obviously aren't doing their jobs." (Exh. 96.)

settlement was never reached because, although the parties exchanged numerous drafts, they could not agree on issues such as whether Capolino would be paid for the work he claims he completed. (*See* Exhs. A86–A92, A118–A119.) [22]

On January 25, National Heating filed a Notice of Lien against the Housing Authority for $1,639 for its "repair of vacuum condensation pumps, installation of cold water make-up lines, overhaul centrifugal pump assemblies" pursuant to its contract with Capolino on Winbrook. (Exh. A44.) On February 26, Naber Thomas filed a Notice of Lien against the Authority for $44,356 for furnishing and installing "complete fire alarm system, intercom system and heat timers." (Exh. A45.)

Between April 23rd and March 2nd, Tascione sent two letters to White Plains Officials and one to HUD stating that Capolino had been defaulted due to non-performance. (Exhs.116–118.) On March 2nd, Tascione sent a letter regarding both Winbrook and Schuyler to Arthur Maurice, Director of the Office of Public Housing at HUD advising him that the Authority had declared Capolino in default and asking that "HUD consider appropriate sanctions against this contractor as a result of his non-performance and non-compliance with the terms and conditions of his contract. These delays have resulted in significant inconvenience and delays to the tenants residing in White Plains as well as management, ultimately resulting in increased costs." (Exh. 130.) Capolino was never sanctioned. (Tasc., 785.)

Under the assumption that Tascione's letters of default and termination to Capolino were valid, General and the Authority signed an agreement for completion of the remaining work on the Winbrook and Schuyler contracts ("the Completion Agreement") after the settlement negotiations broke down in early March. (Exh. Pl.) The Completion Agreement provided that the Authority would pay General the remaining contract balances plus any additional amounts resulting from change orders. The amounts remaining under the contracts were $33,857 for Winbrook and $66,127.15 for Schuyler. Ackerman Construction Consultants, Inc. ("ACCI"), whose principal was Norman Reu, was approved as a qualified contractor for the completion of the work. Attached to the Completion Agreement were two letters written by Arnold on February 9, 1993 listing the work either to be corrected or completed by ACCI on each project. (*Id.*)

General spent the reasonable sum of $55,739 to complete the Winbrook Contract. These costs were as follows:

1) **$1,750** to Cali Brothers to patch holes in the stairwell floors at Winbrook. (These holes had been improperly cut for conduit relating to the fire alarm system later installed in the elevator shaft.) (Stip.# # 62–66.)

2) **$250** to Cali Brothers to perform miscellaneous painting. (Stip.# # 67–69.)

3) **$44,356** to Naber Thomas to complete its electrical work under its subcontract with Capolino.[23] (Stip.# # 84–87.)

4) **$1,639** to National Heating to complete its mechanical work under its subcontract with Capolino.[24]

5) **$7,744** to ACCI to perform work on the vacuum pumps to replace the check, gate and relief valves. (Pl.Exh. 26.) [25] This work,

---

22. For example, on January 15, Capolino's attorney (Meyer) wrote the Authority's attorney (Drummond) stating "I am enclosing a *proposed* settlement agreement. While this draft has been preliminarily approved by Ken Capolino and Ben Lentz for the surety, they reserve their rights with respect to any final comments." (Exh. A86, emphasis added.) On February 9, Meyer wrote Drummond that he was "pessimistic about avoiding litigation." (Exh. A91.)

23. Electrical work remaining to be done under the Winbrook Contract included some inspection and correction work on the intercom system and fire alarms and some miscellaneous work (*e.g.* recessing some items that were surface mount-

ed). (Exh. 125; Reu, 1076, 1092; Arnold, 894.) Naber Thomas' subcontract was for $174,750. (Stip.# # 84–87.) Capolino had paid Naber Thomas only $130,394. (Exh. A41.)

24. The subcontract was for $6,830. Capolino had paid Naber Thomas $4,951. (Stip.# # 108, 112–115.)

25. This included: a $2,000 professional fee to Norman Reu for 26 hours at $75/hr to arrange and coordinate inspection and work on the valves (Reu, 1105); $4,400 to National Heating to replace the valves (Stip.# # 110, 116–117); and $1,344 to ACCI, a 21% mark-up for profit and overhead. (Stip.# 29.)

though perhaps unnecessary,[26] was required by General Requirements Section 15500 1.02(C)(3) "Replace valves, etc. at each pump." As discussed above, Capolino had written misleading notations on the specifications it originally provided National Heating, thus its subcontract bid did not include replacement of these valves as the contract required.

In addition, General spent $24,470 to do work demanded by the Authority that was outside the scope of the Winbrook Contract, as follows:

1) $11,591 to ACCI to repair damage to the fire alarm system at Winbrook under protest that it was not under the contract.[27] (Stip. # # 88–93; Exh. 36.) This was extra work, since the HUD General Conditions ¶ 34(C)(4) clearly provided that the Housing Authority assumed all risk of loss due to vandalism.[28] Arnold testified that Capolino had previously done this work and there was no evidence that the vandalism was traceable to Capolino. (Pl. Summary of Salient Deposition Testimony p. 3, Arnold Dep., pp. 43–46.)

2) $1,331 to ACCI to furnish and install additional transformers and relays to accommodate upgraded electric door locks installed by the Authority after Capolino was terminated.[29] This work was not contemplated by the Winbrook Contract. (Cap., 1176.)

3) $11,548 to ACCI to refurbish the steam control valves and replace a linkage on a boiler valve under protest. (Pl.Exh. 35.)[30] As discussed above, this work was not contemplated by the contract, which required the heat timers to tie into existing steam control valves.

The Authority paid General the $33,758 remaining on the Winbrook Contract upon General's satisfactory completion of the project. (See Stip # 31; Exh. A37.)

26. The work was perhaps unnecessary because there is no evidence that the vacuum pumps were not delivering steam to the buildings. The only complaint, that the system was going "full-tilt" (Arnold, 277–78), would indicate a malfunction in the steam control valves, not in the vacuum pumps. Between September 2 and March 4, Pockl, Superintendent of Maintenance, wrote four letters to Tascione informing him that the heating was "operational," "functioning reliably," "or relatively successful," that fuel consumption was up due to an increase in degree days, and that there had been a few tenant complaints about the ambient temperature but these had been resolved. (Exhs.23, 63, 74, 75.)

However, Pockl did state in September that "it is strongly recommended that the additional work, outlined in my letter to Gismondi and Arnold be accomplished in order to ensure continued reliable operating of these units." (Exh. 23.) In February he wrote that he looked "forward to getting the heat-timers operational and to corrective repairs being made to eliminate condensate return unit deficiencies. Both measures will add significantly to system operational reliability and efficiency." (Exh. 74.)

27. This included: a $4,000 professional fee to Norman Reu for 53 hours of work to inspect and determine the work necessary, as well to coordinate its completion and testing with the Authority, various contractors, and the City of White Plains (Reu, 1105–08); $5,580 to Naber Thomas do the actual repairs (Stip.# # 88–94); and $2,011 to ACCI (a 21% mark-up for profit and overhead). (Stip.# 29.)

28. Paragraph 34(C)(4) provides:

The [housing authority] shall assume risk of loss with respect to any building occupied by it under the terms of this agreement, provided, the Contractor shall assume full responsibility for loss or damage traceable to its fault or negligence in the performance of the contract. (Exh. 1.)

29. This included: $1,100 to Naber Thomas do the work and $231 to ACCI for its 21% profit and overhead mark-up. (Stip.# # 95–96, 29.)

30. This included: a $6,000 professional fee to Norman Reu for 80 hours of work at $75/hr to get a proper directive from Dalton, to work with a subcontractor to take the valves apart and determine the necessary work, to supervise the replacement of the interior working parts, to supervise the purchase and installation of four new valve motors, and to work with Naber Thomas to accomplish the electrical work (Reu, 1108–09); $500 to Nationwide Plumbing & Heating Co. for inspecting, cleaning and lubricating and otherwise refurbishing the existing steam valves (Pl. Exh. 18; Stip. # # 119–124); $1,380 to Kent Supply Co. for four new motors (Pl. Exh 22; Stip. # # 143–148); $575 to Nationwide Plumbing and Heating Co. to install the new motors (Pl. Exh. 19; Stip. # # 125–130); $943 to Naber Thomas to purchase and install new relays (Stip. # # 101–106; Pl. Exh. 14); and $1,969 to ACCI, a 21% mark-up for overhead and profit. (Stip.# 29.) In addition, ACCI spent $181 for a linkage assembly for a modulating valve on the boiler. (Stip.# # 131–36.)

General spent the reasonable sum of $59,-416 to complete the Schuyler Contract. These costs were as follows:

1) $22,334 for the delivery and installation of the elevator windows. This included the $13,100 ACCI paid to ROMCO upon delivery of the windows (which had been ordered by Capolino) and $9,234 of labor to Terance Maughan for their installation. (Stip. # # 32–41; Cap. 381, 454–55.)

2) $2,615 to Naber Thomas for electrical work he had done at Schuyler under his contract with Capolino. Naber Thomas performed this work, but was never paid by Capolino. (Stip.# # 76–81.)

3) $22,300 for the purchase and installation of 26 double hung EFCO windows. This included:

a) $9,975 to Terance Maughan for the EFCO windows (Pl. Exh. 29; Stip. # # 41–46);

b) $2,850 to Terance Maughan for their installation (*Id.*);

c) $495 to Terance Maughan to modify the existing day care window openings to accept the EFCO window (Stip.# # 47–49);

d) $6,000 to Cali Brothers to remove the temporary windows installed by the Authority in the day care center, to reframe the metal stud openings to match the masonry openings and to finish all twenty-six windows, including finishing the drywall around the windows (Pl. Exh. 5, Reu 1078; Stip. # 50);

e) $2,800 to Cali Brothers to install the metal sills for the 26 windows and the elevator windows (Pl.Exh. 6); and

f) $180 to Turner and Harrison, Inc. for cutting down the hollow window sills bought by Capolino for the 26 double hung windows (Stip.# # 72–75).

4) $550 to Cali Brothers to repair a metal door jamb at Winbrook, to refinish the new ground floor bathrooms at Schuyler and to caulk and touch-up paint as required where surface mounted conduit had been recessed.[31] (Stip. # # 58–61; Pl. Exh. 7.)

5) $1,305 to Terance Maughan for overtime work required in order to complete the installation of the windows while the day care center was closed for vacation. (Stip.# # 47–49.)

6) $10,312 to ACCI as its 21% mark-up for overhead and profit for managing the work. (Pl.Br., 30.)

The Authority paid General $62,682 of the remaining $66,127 remaining on the Schuyler contract upon General's satisfactory completion of the project.[32] (*See* Stip. # 31; Pl. Br. p. 6, n. 2.) [33]

Lastly, General paid $8,872 for the insurance coverage required on both projects, which was the same coverage as was required under both the Winbrook and Schuyler contracts. (Stip.# # 154–155.) Of this amount, based upon the costs to General to complete the contracts, $5,057 is attributable to Winbrook (57%) and $3,815 is attributable to Schuyler (43%).[34]

## CONCLUSIONS OF LAW

### I. IN GENERAL

■ 1. The Authority was entitled to refuse to pay a payment application unless it was certified by the Architect.

---

31. For the sake of convenience, we will attribute the entire $550 to the Schuyler Contract, as did General in its brief, although some of the work was done on Winbrook. Our decision to do so does not affect the net awards to the various parties.

32. The $3,545 difference was withheld by the Authority at the direction of the New York State Department of Labor because General was unable to obtain certified payrolls from Romco Sales for fabrication and supply of the lobby windows. General has recouped that money from Romco and has not demanded it from the Authority. (General Br. p. 6, n. 2.)

33. In addition, General spent $201 to do work requested by the Authority that was outside the scope of the Schuyler contract. This extra work was performed on the 26 windows by Terance Maughan. (Stip.# 40.) General has made no claim for this minor amount and we decline to award it.

34. Calculated as follows: Cost to complete Winbrook = $55,739 + $24,470 (extra work) = $80,209. Cost to complete Schuyler = $59,416. Thus, the total spent by General was $139,625. Winbrook represented 57%. ($80,209/$139,625) × 100).

Certification by the Architect was required under both the HUD General Conditions ¶ 6(C) and A.I.A. General Conditions ¶ 9.6.1 before a payment is due on an application. Although General Requirements Section 01741 provides that the payments will be on estimates certified by the Owner, the Authority was entitled to delegate this responsibility to its Architect, as both the A.I.A. and HUD General Conditions contemplate.

## II. WINBROOK

2. Capolino did not materially breach the Winbrook contract by failing to pay its subcontractors prior to Arnold's refusal to certify the September payment.

■ It is true that a party that seeks to recover damages from another party for breach of contract must show that it itself is free from fault in respect to performance. 22A N.Y.JUR.2D § 417; *Cf. Ellenberg Morgan Corp. v. Hard Rock Cafe, Assoc.*, 116 A.D.2d 266, 500 N.Y.S.2d 696, 699 (1st Dep't 1986) (a party may not insist upon performance of a condition precedent when its non-performance has been caused by the party itself). The Authority alleges that at the time it refused to pay the September application, Capolino was in breach of the contract, (specifically, A.I.A.¶ 9.3.3, *supra*), by failing to pay its subcontractors.

■ Initially, we note that any failure on Capolino's part to pay his subcontractors would not justify the Authority's failure to make progress payments to him. There is no evidence to suggest the Authority had knowledge of Capolino's alleged failure when it failed to make its payment, and it could not and did not use failure to pay subcontractors as a reason not to certify payment. *U.S. for the Use and Benefit of D'Agostino Excavators, Inc. v. Heyward–Robinson Co.*, 430 F.2d 1077, 1086 (2d Cir.1970) (contractor entitled to withhold payment from subcontractor to protect itself from liability to subcontractor's suppliers only if the contractor knew of the amount withheld, notified the subcontractor of its intent to withhold this amount; and actually withheld payments for the purpose of protecting itself), *cert. denied*, 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971). Neither the rejected payment applications, nor Tascione's November 9th and 23rd letters of default mention failure to pay subcontractors as one of the concerns of the Authority.

■ Moreover, the Authority has not met its burden of proving that Capolino had materially breached his warranty to pay his subcontractors. Under A.I.A. ¶ 9.3.3, when Capolino signed an application for payment he warranted that all work for which "Certificates for Payment have been previously issued and payments received from the Owner, shall, .... be free and clear of liens ...." (emphasis added). Capolino's submission of the August payment application did not breach this warranty.[35] Though Capolino did breach the ¶ 9.3.3 warranty with his September payment application, this breach was cured within two weeks and was not material.[36]

---

**35.** As of August 31st, Capolino had only received payment for work completed through June 30 (paid July 27): (*See* n. 6, *supra*.) This included $100,000 for electrical work. (Exh. A15.) However, Naber Thomas did not bill for electrical work until July 1st and 31st, and Capolino paid these amounts on July 31st. (Exh. A41.) Thus, although he had not paid Naber Thomas 90% of the $100,000 he had received, he had paid Naber Thomas what Naber Thomas had billed through June, and even July, though he was not paid for July until September 9. (A41; n.6, *supra*.)

**36.** As of September 9, Capolino had been paid $137,500 for Heat Timers and Vacuum Pumps, for work through July 31. (Exh. A16.) Thus, even allowing for a 15 day grace period after receipt of payment by the Contractor under GENERAL MUNICIPAL LAW SECTION 106b for payment of subcontractors on public works projects, at the end of September, Capolino should have been current through July 31. While according to the amounts he was billing the Authority, he should have paid Naber Thomas $123,750 ($137,500 × 0.9), Naber Thomas only billed $134,010 through July 31, entitling him to $120,609 ($134,010 × 0.9). (Exh. A41.) When he submitted the September payment application, Capolino had paid Naber Thomas $109,694, (*id.*), approximately $10,915 less than he was owed. However, about two weeks later, on October 16, Capolino paid him another $20,700, bringing the total he paid to Naber Thomas up to $130,394. (*Id.*) This payment was tendered with a proviso that it was "payment in full to date for your portion of contract." (Exh. 132.) The payment cured his breach of warranty for the September payment application, since under either method of calcu-

Nor has the Authority established that the Capolino firm breached its warranty to pay National Heating. When Capolino was paid October 7 for its August payment application, it had billed and been paid $17,500 for Vacuum Pumps. (Exh. A17.) This left only $1,000 in the category. However, Capolino had paid National Heating, the vacuum pump subcontractor, only $4,951, leaving $1,639 unpaid on its $6,590 contract. (Stip.# # 113–114.) There is no information in the record about National Heating's billing, but assuming that National Heating had billed its entire contract price by August 31,[37] this could only be $6,590 − $1,000 (withheld) = $5,590. Less retainage, the amount owed to National Heating would be $5,031, a difference of $40, and not a material warranty violation.

■ 3. Arnold was obligated by the contract to certify the undisputed amounts Capolino requested for work on the "Clean–Up/Punch List" ($500), on "Vacuum Pumps—Cold water makeups" ($1,219), and at least $10,000 of $15,000 requested for the Electrical work on the fire alarms, and his failure to do so was a breach of contract.

A.I.A. ¶ 9.5.1, *supra,* prescribes two procedures for the Architect to withhold payment. First, if the Architect cannot certify the amount of work claimed is done in accordance with the contract documents, he is to notify the Contractor and Owner and if the Architect and Contractor cannot agree on a revised amount, he must "promptly issue a Certificate for payment for the amount for which the Architect is able to make such representations." (*See supra* ; Exhs. 1· and 81.) Second, the Architect may withhold payment in full or in part to protect the Owner from loss due to listed reasons, including, "defective work not remedied," "failure of the Contractor to make payments properly to Subcontractors . . .," "reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum," or "persistent failure to carry out the work in accordance with the Contract documents." (*Id.*)

It is not disputed that Capolino had performed the $500 of work on the "Clean–Up/Punch List" and the $1,219 of work on "Vacuum Pumps—Cold water makeups" for which he requested payment for in September. (Arnold, 948–49.) Arnold's refusal to certify these amounts for payment was a breach of the contract, since he did not follow proper procedure under A.I.A. ¶ 9.5.1. His failure to indicate on the returned applications his reasons for rejecting these amounts precludes the Authority from asserting that Arnold was rejecting them in order to protect the Authority from loss. Arnold did circle the $15,000 he was withholding on Electrical to protect the Authority from loss, drew an arrow connecting the item to the Heat Timers category and wrote "work not 100%." (Exh. 85.)[38] Had he felt that the $500 and the $1,219 needed to be withheld to protect the Authority for this reason, he should so have indicated. He did not, and was thus obligated to certify them for payment, pursuant to the first portion of ¶ 9.5.1.

In addition, while it would be permissible under the contract for Arnold to withhold payment on the Electrical item for "reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract sum," when Arnold disproved the $15,000, there was over $15,374 in retainage left in the contract that could have been applied towards any deficiencies in the heat timers and vacuum pumps. (Exh. A18.) The cost to General for completing both of these items was only $19,292 ($11,548 + $7,744) (*See* pp. 36–39, *supra.*) Two thousand dollars remained in these categories, thus if $5,000 had been withheld from Electrical, all the disputed work could have been completed, with an allowance for any final work to be done on the Electrical system ($15,374· (retainage) + $2,000 (Heat Timers and Vacuum Pumps) + $5,000 (Electrical) − $19,267 = $3,107).

lating his obligations to Naber Thomas, he had paid Naber Thomas through July.

**37.** National Heating's Notice of Lien states that the $1,639 remaining on the contract was owed on August 28. (Exh. A44.) However, $1,000 was subsequently disapproved by the Architect.

**38.** Arnold testified that he withheld this amount because of the dispute involving the vacuum pumps and heat timers and that he felt there was not enough money remaining in these categories to cover the required work. His markings on the Electrical item adequately communicate his reason. (Arnold, 949.)

While we do not require that the Authority be able to accurately forecast the cost of this work, to withhold the entire $15,000 was unreasonable. Moreover, the Authority should have recognized that the Contractor had a reasonable interpretation of the steam generator specifications and that this work may be later determined to have been an extra.

While it is true that Capolino could have submitted revised payment applications, his failure to do so does not excuse Arnold from certifying the proper portions of the application Capolino had submitted, and it was his obligation to do so.

■ 4. Capolino was justified in suspending performance of the contract when Arnold refused to certify his September payment application. ˙ (Exh. 1, (A.I.A.¶ 9.7, *supra* )); 22A N.Y.Jur.2d § 414 (1996) (non-payment of installments according to the terms of the contract justifies the contractor's refusal to proceed with performance); *In re U.S. Air Duct Corp.,* 38 B.R. 1008, 1016 (N.D.N.Y. 1984)˙ (where failure to make agreed upon progress payments prevents performance by the subcontractor, it is a material breach that justifies suspension of performance by the subcontractor).

■ 5. Capolino was legally entitled, under the Contract, specifically under HUD General Conditions ¶ 14, to send his October 9 letter to Tascione, the Contracting Officer, informing him of the dispute and setting forth his position on the issues. Although the Authority argues that Capolino should have followed the dispute resolution procedures under A.I.A. ¶ 4.3 and submitted the dispute to the Architect,[39] the Authority itself concedes that "in the event of a conflict among the General Conditions, the HUD General Conditions prevail, supplemented by the General Requirements." (Proposed Findings of Fact together with Conclusions of Law and Legal Citations on behalf of the Authority, 17.) While Capolino was not entitled to condition his future performance on the Authority's issuance of a Change Order for work on the vacuum pumps and heat timers under HUD ¶ 9 as he requested, (exh. 33), Tascione was obligated to render a decision on Capolino's letter so that Capolino could proceed with the work and later seek arbitration on the decision. One such permissible decision would have been to inform Capolino that, as Contracting Officer, he chose to adopt the Architect's and Engineer's positions, and to direct Capolino to complete the work that Dalton and Arnold required.

**39.** The A.I.A. General Conditions provide a different and more detailed procedure for resolving disputes than do the HUD General Conditions. The A.I.A. General Conditions provide:

**4.3 CLAIMS AND DISPUTES**

**4.3.1 Definition** .... claims must be by written notice....

**4.3.2 Decision of Architect.** ˙*Claims, including those alleging an error or omission by the Architect, shall be referred initially to the Architect* for action as provided in Paragraph 4.4.4. *A decision by the Architect, as provided in subparagraph 4.4.4, shall be required as a condition precedent to arbitration or litigation of a claim* ....

\* \* \* \* \* \*

**4.3.4** Continuing Contract Performance. *Pending final resolution of a Claim including arbitration, unless otherwise agreed in writing the Contractor shall proceed diligently with performance of the Contract* and the Owner shall ·continue to make payments in accordance with the Contract Documents.

\* \* \* \* ·\* \* ·\*

**4.3.7** Claims for Additional Cost. If the Contractor wishes to make Claim for an increase in the Contract Sum, written notice as provid-

ed herein shall be given before proceeding to execute the Work....

\* \* \* \* \* \*

**4.4 RESOLUTION OF CLAIMS AND DISPUTES.**

**4.4.1.** The Architect will review Claims and take one or more of the following preliminary actions within ten days of receipt of a Claim: (1) request additional supporting data from the claimant, (2) submit a schedule to the parties indicating when the Architect expects to take action, (3) reject the Claim in whole or in part, stating reasons for rejection (4) recommend approval of the Claim by the other party or (5) suggest a compromise. The Architect may also, but is not obligated to, notify the surety, if any, of the nature and amount of the Claim.

\* ·\* \* \* \* \*

**4.4.4**.... If a Claim has not been resolved after consideration of the foregoing and of ·further evidence presented by the parties or requested by the Architect, the Architect will notify the parties in writing that the Architect's decision will be made within seven days, which decision shall be final and binding on the parties but subject to arbitration....·

(Exhs. 1 and 81, emphasis added.)

While his November 9th letter comes close to announcing such a decision, it took him an unreasonable length of time to send this letter, and when he eventually did so, it was not sufficiently specific to inform Capolino what work he needed to do. (Exh. A74.) Instead of directing Capolino to "perform all aspects of your contract in accordance with the specifications, not in accordance with your desires," Tascione should have specified the work that Capolino was required to perform under his interpretation of the contract. Of course, Tascione could have simply demanded performance of such a specification compiled by Dalton or Arnold. Norman Reu testified that when he took over, it took "quite a bit of back and forth discussions" to get specific direction from the Authority as to the scope of work they believed to be required by the Contract. (Reu, 1069.)

6. Capolino's November 30th letter to Tascione terminated the Winbrook contract.[40] (Exh. A37.)

 "The breach of a contract during the course of performance gives the injured party a choice of rescinding the contract for the breach, or treating the breach as terminating further duty of performance on his part and suing for damages, or continuing the contract and reserving his right to dam-

ages for the breach." 22A N.Y.Jur.2d § 497 (1996). Although Capolino argues that despite his unequivocal statements of termination, he continued performance and thus did not terminate the contracts, his performance was limited to a few isolated incidents of subcontractors completing punch-list items and was not sufficient to maintain the contract.[41] 22A N.Y.Jur.2d § 429 (1996), (citing *Ferguson Contracting Co. v. State*, 202 A.D. 27, 195 N.Y.S. 901, 907 (3rd Dep't 1922) (If one party has breached its contract in a substantial measure, the injured party need not regard it as a discharge; he may continue to perform and reserve his right to recover the damage he has suffered by the breach, but in such a course he keeps the contract alive for both parties; and, in order to recover later for such breach, *he must perform in all essential respects upon his part.*), *aff'd*, 237 N.Y. 186, 142 N.E. 580 (1923)). After November, no progress was being made towards resolving the major areas of dispute, including work on the vacuum pumps and heat timers. While the Authority erred by failing to give Capolino specific direction, if Capolino had wished to continue performance under the contract, he should not have sent a termination notice, but instead should have sent the Authority a notice that he would perform further work under protest.[42]

**40.** The Authority argues that Capolino terminated the contract with its letter of November 19 by rather confusingly stating "we hereby give you the seven additional days notice and consider our contract terminated." (Exh. A36.) This letter is best read as a default notice, since on November 30, Capolino sent a notice of termination that was not ambiguous. (Exh. A37.)

**41.** In addition to coordinating the performance of minor punch list work, *see* n. 21, *supra*, after the October 9 meeting, Capolino sent Tascione three letters detailing alleged improper actions by the Authority and requesting a meeting. However, the letters he sent in November either stated that he had defaulted the Authority or that the contract was terminated. (Exhs. 88 (10/9); 61 (11/25); 62 (11/30).)

**42.** The cases cited by Capolino and the Authority on this point involve either anticipatory repudiation (unjustified expression of intent not to perform) or abandonment, and are not particularly helpful in a situation in which a contractor terminates a contract for breach by the owner.

For example, Capolino attempts to rely upon the following language from *Cauff, Lippman &*

*Co. v. Apogee Finance Group*, 807 F.Supp. 1007, 1021 (S.D.N.Y.1992) that "Abandonment may be inferred from the attendant circumstances and the conduct of the parties, but such conduct must be positive, unequivocal and inconsistent with an intent to be further bound by the contract .... there must be a repudiation of the contract *and a refusal to perform it*," (emphasis added), to support his position that he did not terminate the contract. Capolino's November 30th letter, however, was a clear written *termination*, not an abandonment; it leaves nothing to be inferred from the circumstances. Moreover, essential to the *Cauff* Court's ruling was its conclusion that Cauff "at all times indicated that it was willing and able to proceed." (*Id.*) Capolino's letters, (with the exception of one ambiguous one), do not so indicate this, in fact, many request damages. While several letters do request a meeting, a fair interpretation of these requests is that Capolino sought a meeting to iron out the termination and the damages that he sought. (*See* Exh. 62.) At no time did Capolino attempt to proceed with work on the vacuum pumps or steam valves while reserving his rights to arbitrate.

■ Nor do the parties' efforts at settlement establish that the contract was still in force. These talks were merely an attempt by the parties, each having a reasonable argument that the other had breached the contract, to work out a settlement of claims that would avoid the need for expensive and time-consuming litigation over such minor amounts. It was never contemplated that Capolino would return to complete the work. (*See* Exh. 71.)

■ 7. Capolino's November 30th termination was justified under basic principles of contract law and under A.I.A. ¶ 14.1.1.3 because of Arnold's failure to certify the uncontested portions of the September progress payment. In addition, Capolino would have been entitled to terminate under ¶ 14.1.3 due to Tascione's failure to issue adequate direction to proceed.[43] Arnold's failure to certify the uncontested portions of the progress payment was a material breach of the contract justifying termination. "The right to withhold a progress payment for work performed by a subcontractor may only be exercised where circumstances clearly warrant it, because in most instances the installment payment is vitally needed by the subcontractor to carry out his obligations under the contract. An unjustified withholding may give the subcontractor the right to renounce the subcontract." *Scaduto v. Orlando*, 340 F.2d 293, 300 (2d Cir.1965), *cert. denied*, 380 U.S. 978, 85 S.Ct. 1341, 14 L.Ed.2d 272 (1965); *see Seglin Constr. Co. v. Columbia Cas. Co.*, 239 A.D. 803, 264 N.Y.S. 144, 146 (2d Dep't 1933) (breach would occur where some money due, even if amount of money demanded for progress payment is excessive).

■ 8. The Authority's letters of default and termination are of no legal consequence since the contract was previously terminated by Capolino. *Cf. United States v. Digital Prod. Corp.*, 624 F.2d 690, 694 (5th Cir.1980) (while it was "unfortunate" that the government Contracting Officer did not accept the Contractor's repudiation, the Contracting Officer's subsequent sending of notice of termination did not change the conclusion that the Contractor had earlier terminated the contract). Capolino himself reiterated on December 9 that he had terminated the contracts as per HUD ¶ 14.1.1.3. (Exh. 65.)

9. The Authority did not terminate the contract for convenience under HUD ¶ 17. Capolino terminated the contract.

■ 10. As a non-breaching party, Capolino is entitled to recover the contract price less the progress payments received and the cost of completing the contract. *U.S. for the Use of N. Maltese and Sons, Inc. v. Juno Constr. Corp.*, 759 F.2d 253, 255 (2d Cir.1985); *In re U.S. Air Duct Corp.*, 38 B.R. at 1016.

Thus, Capolino is entitled to:
The amount left on the Winbrook contract ($33,758) minus
1) the amounts owed on the subcontractor contracts ($44,356 to Naber Thomas and $1,639 to National Heating)—
2) the amount paid to National Heating ($4,400) and to Norman Reu ($2,000) for completing the work on the vacuum pumps.[44]

**Thus, Capolino gained $18,637 when the Authority breached the contract and is entitled to no damages.**

■ We decline to deduct as costs to complete the contract the $1,750 General

---

**43.** Paragraph 14.1.3 requires that no work be done for 60 days prior to termination. (Exhs. 1 and 81.) The evidence indicated that after the fire alarm system was essentially completed in September, no progress other than punch-list items was made on the Contract in October or November. Capolino terminated November 30th.

**44.** Capolino should not have written "ONLY IF NEEDED" on the specifications it provided National Heating, and is thus liable for the consequences of National Heating's failure to bid the project in accordance with the specifications. We thus charge him the labor costs of completing the vacuum pump work (both National Heating's and Norman Reu's), because in order for his firm to comply with the specifications he would have had to pay National Heating the extra money, and he would have had to spend his own time evaluating, bidding and coordinating the work. We consider the value of Norman Reu's time a reasonable estimate of the value of the time Mr. Capolino himself would have had to spend.

paid to Cali Brothers to patch holes in the stairwell or the $250 it paid for miscellaneous painting, because if the Authority had not breached and Capolino had completed the project, Capolino would have been able to compel Cali Brothers to perform this work under their existing subcontract or to pay the cost of having the work done by someone else. In addition, we decline to deduct the $1,344 profit and overhead General paid ACCI to finish the vacuum pumps, since the Authority wrongfully called in the surety to complete the Contract. These amounts total $5,344.

9. The Authority is entitled to **$18,637** on its restitution claim against Capolino on the Winbrook contract (Auth. Cross–Claim 3), since the cost to complete the contract exceeded the contract price.

■■■■ 10. The Authority was not entitled to demand that General complete the Winbrook contract because Capolino properly terminated the contract upon the Authority's breach. *General Ins. Co. v. K. Capolino Const. Corp.*, 908 F.Supp. 197, 199 (S.D.N.Y. 1995) (General was required to comply with the terms of its performance bonds only if there was no owner default). Thus, General is entitled to recover on its unjust enrichment claim against the Authority (claim 4) for the costs it incurred in completing the Winbrook contract, less the amount the Authority paid General. *Carchia v. United States*, 202 Ct.Cl. 723, 485 F.2d 622, 628–30 (1973). These costs are **$55,739** (labor and materials) + **$5,057** (insurance) − **$33,758** = **$27,038**.[45]

11. General is entitled to recover **$24,470** on its claim against the Authority for unpaid monies for extra work it performed to complete the Winbrook contract (Claim 6). *See* 22 N.Y.JUR.2D § 293 (1996) (recovery may be had for extra work outside the contract where the contractor was in fact specifically ordered to do work not within the scope of the contract).

### III. SCHUYLER

■■■■ 12. Arnold was obligated under A.I.A. ¶ 9.5.1 to certify for payment the undisputed amounts Capolino sought for work completed at Schuyler.[46] These amounts were the $1,500 requested for Hollow Metal/Hardware, the $5,300 requested for Ceramic Tile, the $500 requested for Acoustical Tile, and the $1,000 requested for Painting, totaling $8,300. (Exh. 85.) If Arnold had felt he was justified in withholding these amounts because the windows would exceed their budget, he should have so indicated on the payment form.

13. After Capolino clarified his September payment application October 9, Arnold was obligated under A.I.A. ¶ 9.3.2, *supra*, to certify for payment at least $12,000 of the $13,000 for Wire Guards and the $2,000 for Sills he requested.[47] While no windows had been approved, Capolino had paid for materials ordered that were later used in the project, with minor adjustment ($180) and the Authority was obligated to pay him for these materials. Though the window category apparently had been underbid, if Capolino had been paid everything he had requested in his September payment application (less $3,000 holdback on windows), the amount left in the contract plus retainage would have been $44,-322.15 ($31,000 (contract balance) + $10,222 (retainage) + $3,000 (hold-back).) (Exh. 85.) General spent $59,416 to complete the entire contract. (Capolino argues this amount was excessive.) This included $10,312 in profits to ACCI, $1,305 in overtime to Terance Maughan, and $2,000 for removal of the temporary windows (*see* Conclusion of Law # 21, below) that cannot be charged against Capolino. Thus, based upon General's costs, it would have cost Capolino $45,799 to complete the work. While this is roughly $1,000 more than the amount left, the difference is not significant. We note that our calculations do

---

45. This includes the professional fees paid for Norman Reu's time, in addition to the 21% profit and overhead. Reu's time can reasonably be considered as part of the labor cost, and General did not act improperly in paying him.

46. Where it would be duplicative, we do not repeat the legal analysis we performed in analyzing the Winbrook contract, *supra*.

47. Recall that Capolino had paid $12,430 for sills, window guards and other materials. (Exh. 87.)

not account for the $5,865 Change Order requested to substitute Bruno and Campisi as plumbing subcontractor. Again, we would not require the Authority to exactly predict the cost of completing the contract, but it was unreasonable to withhold the entire $15,000 when Capolino had in fact paid over $12,000 for materials.

14. The failure of the Authority to accept any of Capolino's submissions for the 26 day care windows as equals was not a breach of General Requirements Section 01740. Since the specifications were clear, we assume that the Stamford window upon which Capolino had based his bid would have met the specifications and that if Stamford had not gone out of business, Arnold would have accepted it as an equal. (Cap., 390–91.) Arnold accepted an equal to the EFCO windows specified for the elevator lobbies. (Exh. A99.)

▮ 15. Capolino did not breach the contract by failing to submit conforming windows before his termination of the contract. He had until May. Nor did he materially breach the contract by failing to provide 3/4" plywood temporary window coverings, although the contract called for these. He did provide security screens and sheathing, and neither Tascione nor Arnold demanded the substitution of plywood, but instead suggested that Capolino install temporary windows, which the contract did not require. The delay in approval of the windows, though not a breach, was due to an unwillingness to bend on *both* sides. On the Authority's side, it declined (as was its right) to approve any of Capolino's window submissions as equals, without suggesting a possible equal. On Capolino's end, though he diligently submitted several proposals of "equal" windows, he

steadfastly refused simply to submit the EFCO windows provided in the specifications, even though the difference in price was apparently only $2,375 ($9,975 − $7,600) (Cap.390–391.)

16. Capolino was justified in suspending performance on the Schuyler contract when Arnold failed to certify the amounts properly requested for Hollow Metal/Hardware, Ceramic Tile, Acoustical Tile, Painting and Windows.

17. Capolino was legally entitled, under HUD ¶ 14, to send the October 9th letter to Tascione informing him of the dispute on Schuyler and requesting a decision on whether his window submissions were equals and on his request for a plumbing Change Order. (Exh. 33.) Tascione's October 16th letter, (telling Capolino he had received the application for payment "previously rejected as overstated" by Arnold and noting that the Plumbing Change Order had previously been disproved), was adequate to fulfill his obligation to make a decision on these issues.[48] (Exh. 89, *supra*.) The specifications on the windows were clear and Capolino knew or should have known what he needed to do to comply. The Authority should have paid him for work he had completed, and Capolino should have continued with the work under protest pursuant to A.I.A. ¶ 4.3.4.[49]

▮ 18. Capolino's letter of November 30th terminated the Schuyler contract. Although Capolino argues that despite his unequivocal statements of termination, he continued to perform and thus did not terminate the contract, his performance was limited to the satisfaction of mere punch-list items,[50] *see supra*, on work he had already essentially

---

**48.** Tascione's November 9 letter informing Capolino that he supported the Architect's position on the windows and that he required a window that met all specifications would also have been sufficient to serve as a decision on the matter that Capolino could later arbitrate, had it not been sent a month after the request for a decision. (Exh. A74.)

**49.** A.I.A. ¶ 4.3.4 provides:
**Continuing Contract Performance.** Pending final resolution of a Claim, including arbitration, unless otherwise agreed in writing the Contractor shall proceed diligently with the performance of the work and the Owner shall

continue to make payments in accordance with the Contract Documents.
(Exhs. 1 and 81.)

**50.** After the October 9 meeting, Capolino sent Tascione at least four letters detailing alleged improper actions by the Authority and requesting a meeting. (Exhs. A88 (10/9), 90 (10/19), 96 (11/25), 98 (11/30).) However, the letters he sent in November stated either that Capolino had held the Authority in default or had terminated the contract and was seeking damages. (Exhs.96, 98.)

completed and been paid for, and was thus insufficient to keep the contract alive. Capolino made no window submissions as Contractor after September 29. His submissions of information on the EFCO and Peerless windows on January 22, 1993 were made at the request of Reu. (Exhs. 101 and A95; Trans., 890.) Nor do the settlement talks in January and February establish that the Schuyler contract was still in force. It was never contemplated in the talks that Capolino would resume performance of the contract. (Exh. 71.)

■ 19. Capolino's termination was justified because of the Authority's failure to pay for work undisputedly completed and materials purchased in September.

■ 20. Capolino is entitled to a Change Order for Bruno and Campisi's plumbing subcontract under A.I.A. ¶ 5.2.3. It is undisputed that the Authority disapproved Capolino's prior subcontractor, thus the more specific ¶ 5.2.3 controls over ¶ 4.3.7. Certainly it would have been preferable for Capolino to have immediately informed the Authority in writing of the price increase, as a matter of courtesy and as an attempt to harmonize the sections of the contract. (Capolino did testify that he orally informed the Authority that Bruno and Campisi were more expensive.) Regardless, even though a 76% increase in labor cost would normally be a basis for a "reasonable objection" under

¶ 5.2.3, this objection was waived by Galli's June 16 letter approving Bruno and Campisi. (Exh. 84.)

■ 21. As the non-breaching party, Capolino is entitled to outstanding balance—cost of completion on the Schuyler contract.

This is:

**$66,127** (original contract balance) + **$5,865** (plumbing change order) (**$71,992**) minus

 **$13,100** for elevator windows

 **$9,234** for removal of the old elevator windows and installation of the new ones [51] (Exh. P3)

 **$2,615** to Naber Thomas for electrical work

 **$9,975** for 26 EFCO Windows [52]

 **$2,850** for their installation

 **$4,000** for reframing the studs to match the masonry for the 26 windows [53]

 **$495** to modify the existing window openings to accept the 26 EFCO windows

 **$180** to cut the sills

 **$2,800** for installation of window sills and touch-up after removal of temporary windows [54]

equals **$26,743**.

■ We decline to assess the cost of purchase, installation or removal of the temporary windows against Capolino, since the Au-

51. Although Capolino estimated that the total labor for both windows would be $3,643, (exh. 133), he did not have a contract for this work and we find no reason to believe that Terance Maughan's costs were excessive. We believe Capolino seriously underestimated the labor for the windows.

52. We reject Capolino's argument that he could have gotten a better price since he was not an out-of-state contractor.

53. This is a pro-ration of the $6,000 that Cali Brothers charged to remove the temporary windows and reframe the openings. Capolino was not responsible for the temporary windows and should not pay to have them removed. (Moreover, it appears the Authority paid their initial installer to have them removed. Exh. A80.) Capolino was responsible for their misframing; it was his firm that did the masonry. Capolino attempted to suggest that the windows need not be reframed, but different size windows could be

ordered and you "could build it out a little bit". (Cap.1167.) We find his brief testimony insufficient proof that the EFCO windows could have been ordered to fit without rework, or that the misframing was an error for which his subcontractor was responsible.

54. Capolino suggested at trial that this was a triple charge for removal of temporary windows. This was a charge for installing sills. (Exh. P6.) While it includes touch-up after removal of temporary windows, this touch-up was not included in the original amount paid to the Authority to install and remove the windows, (exh. A80), and we have already deducted $2,000 from the Cali Brothers invoice to ACCI to ensure that Capolino does not pay for removal of temporary windows. Capolino would have been responsible for touch-up after removal of the temporary window coverings, and we do not think charging him what was likely a minute portion of the work to install the sills for touch-up after the removal of temporary windows is unfair.

thority was not entitled to have temporary windows put up as protection. We also decline to assess against Capolino the $1,305 in overtime paid to Terance Maughan to install the 26 windows during a vacation, as Capolino had several months to complete the project when he terminated it for breach. In addition, we decline to assess the $550 paid to Cali Brothers to repair a metal door jamb at Winbrook and to refinish the floors, caulk and touch-up at Schuyler. If the Authority had not breached and Capolino had completed the project, Capolino would have been able to compel Cali Brothers to perform this work under their existing subcontract or to pay the cost of having the work done by someone else.

## IV. THE REMAINING CLAIMS

22. We decline to find General in breach of its settlement agreement with the Capolino firm. This spurious claim is not properly before this Court; it was not raised until Capolino's post-trial reply brief. Moreover, the settlement agreement is not in evidence.

23. Capolino is not entitled to recover punitive damages or his attorney's fees because he has failed to establish the requisite moral culpability on behalf of the Authority to justify such awards.

 Under the American Rule, parties to litigation normally pay their own attorney's fees regardless of the lawsuit's outcome. An exception to his rule occurs where the court has determined that the unsuccessful party has " 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " *Sierra Club v. U.S. Army Corps of Eng'rs*, 776 F.2d 383, 390 (2d Cir.1985), *cert. denied sub nom., New York State Dep't of Transp. v. Sierra Club*, 475 U.S. 1084, 106 S.Ct. 1464, 89 L.Ed.2d 720 (1986). To award fees under the bad faith exception a court must find that the losing parties claims' were "entirely without color and made for reasons of harassment or delay or for other improper purposes." *Id.* (citations omitted.) We find that the Authority's positions with respect to both the Winbrook and Schuyler contracts were

not so unreasonable as to support an inference of bad faith.

 As a general rule New York does not permit recovery of punitive damages in a breach of contract action. *Vanderburgh v. Porter Sheet Metal*, 86 A.D.2d 688, 446 N.Y.S.2d 523, 525 (3d Dep't 1982); 22A N.Y.JUR.2D § 427 (punitive damages may not be recovered in an action for breach of contract) (1996), (citing *Carney v. Memorial Hosp. & Nursing Home*, 101 A.D.2d 990, 477 N.Y.S.2d 735, 737 (3d Dep't 1984), *modified on other gnds*, 64 N.Y.2d 770, 485 N.Y.S.2d 984, 475 N.E.2d 451 (1985).) None of the cases cited by Capolino regarding punitive damages involve breach of contract. *See, e.g., Home Ins. Co. v. American Home Prods. Corp.*, 75 N.Y.2d 196, 551 N.Y.S.2d 481, 550 N.E.2d 930 (1990) (strict products liability); *Walker v. Sheldon*, 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497, (1961) (action for fraud and deceit); *Maloney v. Ruplin*, 232 A.D.2d 381, 648 N.Y.S.2d 311 (2d Dep't 1996) (fraud); *Maxan Curtain Mfg. Corp. v. Chemical Bank*, 230 A.D.2d 832, 646 N.Y.S.2d 701, (2d Dep't 1996) (tortious interference with contract). The Authority cited a case involving breach of insurance contract by the insurer, for bad faith failure to settle within policy limits. *Gordon v. Nationwide Mut. Ins. Co.*, 30 N.Y.2d 427, 334 N.Y.S.2d 601, 608–09, 285 N.E.2d 849 (1972), *cert. denied*, 410 U.S. 931, 93 S.Ct. 1374, 35 L.Ed.2d 593 (1973). That case held that damages "punitive in nature" could exceed the policy limits where there had been a breach of the implied condition of the contract to act in good faith. The Court noted that since punitive damages are not normally awarded for breach of contract, bad faith must be proven to the extent that it demonstrates an extraordinary showing of a disingenuous or dishonest failure to carry out a contract. (*Id.*) No cases were cited for this proposition, and none of the cases it cited regarding the implied covenant of good faith and fair dealing discussed punitive damages. Thus, we are quite dubious of the availability of such damages.[55]

---

**55.** This case was criticized for requiring an "extraordinary showing of a disingengenous or dishonest failure" to carry out the insurance con-

tract before bad faith failure to settle within policy limits could be established. The court held that "gross disregard" of an insured's inter-

As stated above, we reject Capolino's contention that the Authority's cross-claims and the positions it took at trial were so without merit as to constitute bad faith. The Authority's interpretation that Capolino first breached the agreements was reasonable and it was justified in bringing cross-claims for breach of contract. In addition, Capolino makes several arguments in his brief that the Authority's conduct with respect to the contract was in bad faith and thus merits an award of attorney's fees and punitive damages. We find none of these to have merit, as we discuss below.

First, Capolino points to Tascione's refusal to meet or telephone him to discuss the disputes, and his request that Capolino not attend the January 7th settlement meeting (Arnold, 332) as evidence of bad faith. We disagree. The Authority's interpretation of the contracts that the Architect should handle any disputes was reasonable based upon the A.I.A. dispute procedures, though erroneous, and it did not show bad faith for Tascione to rely upon Galli and Arnold to personally communicate with Capolino. Tascione supervised 35 employees, (Tasc., 623), and it was reasonable for him to delegate as many responsibilities to them as possible. Regardless, Tascione wrote numerous letters to Capolino on these issues (*see, e.g.,* exhs. 89, 92, 95), and was not obligated to meet with him personally, particularly after Capolino prematurely ended the October meeting and sent several angry and provocative letters. As for the settlement meetings, Brackenbury noted the "personality conflict" between Capolino and Tascione and Arnold (exh. 71), and it may well have been more productive not to have Capolino present at the settlement meeting. (Tasc., 764.) Capolino's attorney was present, and no binding agreement was entered into without his approval.

Second, Capolino points to Tascione's failure to direct Capolino to perform or to pay for the undisputed work as evidence of bad faith. As we have discussed above, Tascione did direct Capolino to perform on Schuyler,

and he attempted to do so November 9th on Winbrook but was neither timely nor specific enough. Again, Tascione mistakenly, but in good faith, believed he was entitled to rely upon the Architect's responses. The Authority had legitimate, good faith positions regarding the work to be completed on the steam valves, vacuum pumps and windows, and they reasonably believed they were entitled to withhold payment on the applications until he did such work. They thought they had sufficiently informed Capolino of their reasons for withholding the money, and although their communications have been held to lack specificity, they cannot be said to have acted in bad faith.

Third, Tascione's taking the position with Capolino that he was responsible for the delay in the day care center did not evince the type of level of bad faith, vexatious or oppressive behavior to warrant attorney's fees or punitive damages for breach of contract. While it is true that even had the windows been in, the day care center could not have opened due to the default of another contractor (ERA), it is also true that the day care center could not open without windows. Tascione testified that the day care contractor was concerned about completing its work without windows in place to protect the area from damage due to weather and vandalism. (Tasc., 791–92.) Thus, both Capolino and ERA were responsible for the delay. Moreover, this assertion of Tascione in his communications with Capolino caused him no damage.

Fourth, as evidence of bad faith, Capolino points to the three letters that Tascione sent to White Plains and HUD officials stating that Capolino had defaulted due to non-performance, and his March 2 letter to HUD asking that HUD "consider appropriate sanctions against [Capolino] as a result of his non-performance and non-compliance with the contract. These delays have resulted in significant inconvenience and delays to the tenants residing in White Plains as well as management, ultimately resulting in increased costs." (Exhs.116–118, 130.)

est was the proper standard. *Pavia v. State Farm Mut. Auto. Ins. Co.,* 82 N.Y.2d 445, 605 N.Y.S.2d 208, 210, 626 N.E.2d 24, 26 (1993).

We find that Tascione in good faith thought that by refusing to perform the work the Authority sought on the steam generators and vacuum pumps and by ceasing to submit proposed windows for five months after September 29th that Capolino had defaulted under both contracts and was stubbornly refusing to perform, perhaps because his bid had under-estimated the cost of completing the contracts and thus he stood to make little or even to lose on the contracts. By choosing to terminate the Winbrook contract before his subcontractors were paid in full, Capolino gained over $18,000.

It is important to note that Capolino was the first party to mention default and termination, and we find that although he was entitled to do so, he could have avoided this entire breakdown and the subsequent defaults issued by the Authority had he simply sent written notice of his disagreement to the Authority and offered his best efforts to perform the work while reserving his right to seek additional payment. The actions of the parties under these contracts has raised complicated legal questions that have spurred numerous lawsuits. Mr. Tascione is not a lawyer, and his failure to correctly determine that Mr. Capolino's default notices were proper (and thus the Authority's were not) does not show bad faith. He reasonably concluded that in order to best protect the Authority's interests and to get the work finished, he should declare Capolino in default.[56] Thus, he did not act in bad faith when he informed officials he had defaulted Capolino and that sanctions should be considered.[57] He reasonably thought the defaults were proper and that the delays were a result of Mr. Capolino's refusal to adhere to his obligations and that it would be proper for HUD to consider sanctions.

Fifth, Capolino argues that the Authority tried to create a false record of his firm's default. He points first to an October 23rd letter Galli sent to Arnold requesting that Arnold issue a letter to Capolino regarding "abandonment of jobsite." (Exh. 35.) Arnold testified that the Capolino firm was performing miscellaneous work and that he never sent such a letter. (Arnold, 302.) Second, Galli sent a letter to Arnold on October 19, which he signed "Guns and Arrows." (Exh. 91.) Third, he points to Galli's September 30th Construction Update stating that Capolino was "notorious" for not completing work in a timely fashion.[58] (Exh. 108.) While Mr. Galli's statements were exaggerated and ill-considered, we do not think they show the type of bad faith that justifies an award of attorney's fees and punitive damages. Mr. Galli appears to have been under-experienced, careless and too eager to pursue a contractor that from the Authority's perspective, legitimately could have been viewed as refusing to make any real progress in completing the contracts. This was not bad faith, but poor judgment. As Capolino himself has argued, Galli had no authority under the contracts. Arnold testified that he always acted in accordance with his professional judgment and attempted to be fair, regardless of what Galli suggested. (Arnold, 297–98.) Nor do we consider the Authority's reliance on Davis Bacon payrolls to have been in bad faith. They provide legitimate corroborating evidence of an important issue—that the Capolino firm's presence on the jobs amounted to no more than completing punch lists.

Sixth, Capolino implies that the Authority knowingly entered the contracts intending either to accelerate their performance or not to pay their entire balances, because it knew its HUD funding would run out prior to the

---

56. Had Tascione been correct that Capolino had first breached and had the Authority not acted upon the breach, Capolino could later argue they waived their rights.

57. Nor do we think that Mr. Tascione's denial that he sought sanctions at trial evidences the kind of bad faith that would justify an award of attorney's fees or punitive damages. (Tasc., 785.) When he stated he had not asked for sanctions, Mr. Tascione had not been shown the letter requesting sanctions, and he may have simply forgotten. At the time, he was discussing a letter in which he stated that it was his understanding that it was *HUD's intention* to consider the non-performance of Capolino to determine proper sanctions. (*See* Exh. 118.)

58. Galli testified that he thought "notorious" could mean based upon his own experience.

end of the contracts.[59] In the alternative, he suggests the Authority trumped up litigation with his firm in order to get a funding extension pursuant to the CIAP guidelines. We find this argument unconvincing. The Authority paid Capolino 94% of the Winbrook contract balance before the parties' relationship broke down three months before the end of the year.[60] This shows that the Authority never had an intent not to pay Capolino, and that there was still money at the time of the break-down to pay him had the disputes been resolved and the work on the vacuum pumps and steam generators been completed. In fact, Capolino's argument cuts against him, for if the HUD money were going to run out by the end of the 1992, the Authority had every interest in spending it all, rather than delaying by generating "false" default charges. We do not find this issue regarding expiration of HUD grants evidence of bad faith. Tascione testified that getting an extension was simply a matter of procedure, and Galli's December letter mentions delay as a reason for such an extension. (Exh. 114.) Delay is a valid reason for an extension under HUD procedures, (exh. 113, p. 10–6), and there certainly were delays. Moreover, though there was not litigation at the time Galli wrote his March 1st letter to HUD, Capolino had numerous times threatened litigation and the Authority had spent considerable time and effort trying to resolve the dispute to avoid litigation. While Galli's statement was inaccurate, we simply cannot conclude that it is part of a conspiracy on behalf of the Authority not to pay Capolino, rather than an overzealous exaggeration

made in an effort to assure that the money would continue to be there for a project that was not progressing.[61]

Lastly, Capolino argues that the Authority breached its agreement to rescind the defaults and publicly called Capolino bankrupt and then stated he was in default. As we held earlier, there was no such binding agreement. Second, the bankrupt comment was an honest error that was immediately, publicly corrected by Drummond. (Tasc., 730; Drummond, 1018, 1050.) As we explained above, Tascione reasonably thought Capolino was in default, and his public statement of such did not show bad faith.

In addition to finding insufficient evidence of bad faith in the Authority's conduct to warrant attorney's fees or punitive damages, we are also influenced by the rigidity with which Mr. Capolino refused to bend from his position, and the accusative, contemptuous and sarcastic language he used in several of his letters. (For example, on October 29, Capolino ridiculed Mr. Tascione, telling him he didn't work for the "Walt Disney Corporation" or "Fantasy Land." Exh. A73.) Mr. Capolino terminated the October 9th meeting by stating the Authority would hear from his attorneys. (Exh. 88.) This was a situation of bad temper on both sides. To unilaterally punish the Authority for its contributions to the situation would be unfair.

24. Capolino's claim for negligent misrepresentation is without merit.

■ In a claim that strongly resembles the RICO claims dismissed by Judge Brieant

---

**59.** According to the rather scant evidence in the record, the Schuyler grant was awarded in 1991, and would run out in 1993. The contract was scheduled for completion in March. Thus, this argument cannot apply to Schuyler but only to Winbrook. (Tasc., 769.)

**60.** Capolino has failed to establish when in 1992 the Winbrook grant allegedly was to "run out." The first letter in evidence regarding this issue is a December 16, 1992 letter, that requests an extension from March 2, **1993**. (Exh. 114.)

**61.** We note that Capolino has not sufficiently proven any damage as a result of either Galli's or Tascione's inaccurate statements to HUD. While Capolino's brief alleges damages of $250,000 in addition to punitive damages for "legal fees and expenses incurred in contesting denial of two

public contracts to the Capolino firm," (Cap.Br., 28), the only evidence of these expenses is Capolino's testimony that "we were involved in two other litigations, where we were low bidders, and they threw us out after this." (Cap., 255.) He has not provided any details whatsoever as to what those litigations involved, why they resulted from the Authority's conduct, and what they cost him. Such claims are entirely too vague. *See* 36 N.Y.Jur.2d § 13 (1984) ("the law requires that the injury and the resulting damages be shown with reasonable certainty, and not left to speculation or conjecture. No damages can be allowed except such as are shown by the proof to be, at least to a reasonable degree, certain.") (citations omitted).

and the tortious interference with contract claims against Tascione dismissed by Supreme Court Justice Natasi, (*see* exhs. 1–3 Notice of Motion to Dismiss Each and Every Claim against Additional Defendants and Count 2), Capolino's second cross-claim alleges that the Authority and Tascione made negligent misrepresentations in the course of their contractual relationship.

First, Capolino contends that the Authority and Tascione represented to Capolino that it "would be paid progress payments consistent with the stage of its construction performance and that its work would be timely if completed by the 1993 completion dates." (Cap. Br. at 35 ¶ M.) Capolino alleges that this representation was false because the Authority failed to make progress payments after August 1992, even though Galli issued Construction Updates and Arnold submitted claims for payment based upon 100% (95%) completion of Winbrook and 92% completion of Schuyler.

Second, Capolino claims that defendants, instead of making the progress payments, falsely claimed (1) that "vast amounts" of work still needed to be done by Capolino on Winbrook's heat timers, vacuum pumps, fire alarm system, and automatic door entrances, and (2) that, with respect to Schuyler, Capolino failed to submit conforming windows or install temporary windows. (*Id.*)

Third, Capolino alleges that correspondence it received from Tascione, in which Tascione advised Capolino of certain defaults and claimed that Capolino was responsible for delays, were false and negligent. (*Id.* at 36 ¶¶ N, O.)

As a result of these alleged misrepresentations, Capolino states that its "chief executive officer and staff were required to spend countless hours trying to convince the Authority and the Architect that the contracts, A.I.A. General Conditions, HUD General Conditions and General Requirements, Division I, should be enforced as written, and [conducted] otherwise unnecessary correspondence with the Authority, the Architect and general." (*Id.* at 36, ¶ Q.)

▉▉▉▉▉▉ Capolino's negligent misrepresentation claim cannot coexist with its contract claims. Under New York law, it is well-settled that a breach of contract is not a tort unless the breach violates a legal duty independent of the contract. *Fourth Branch Assocs. Mechanicville v. Niagara Mohawk Power Corp.*, 235 A.D.2d 962, 653 N.Y.S.2d 412, 415 (3d Dep't 1997) (citing *Clark–Fitzpatrick v. Long Island R.R. Co.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190, 193 (1987)). Thus, the absence of a special relationship distinct from the contract precludes a claim of negligent misrepresentation. *RKB Enter. Inc. v. Ernst & Young*, 182 A.D.2d 971, 582 N.Y.S.2d 814, 816 (3d Dep't 1992). An ordinary contractual relationship, without more, is insufficient to establish a "special relationship." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 819 F.Supp. 1282, 1293 (S.D.N.Y.1993), aff'd, 57 F.3d 146 (2d Cir.1995); *Congress Financial Corp. v. John Morrell & Co.*, 790 F.Supp. 459, 474 (S.D.N.Y.1992). Instead, a "closer degree of trust, confidence, or reliance," such as that implied by a previous or continuing relationship between the parties, must be shown. *Congress Financial Corp.*, 790 F.Supp. at 474.

Here, Capolino has failed to demonstrate the existence of a special relationship giving rise to a duty independent of the contract. We are not persuaded that the Authority's position as a public entity, Tascione's status as a public officer, or any internal regulations of the Authority give rise to any duty above and beyond defendants' contractual obligations.

Rather, Capolino is seeking to hold defendants liable in tort for their contract breaches.[62] The alleged misrepresentations, even if

---

62. It is for this reason that the instant case is distinguishable from those relied on by Capolino. Here, the conduct that allegedly constitutes negligent misrepresentation and the conduct that allegedly constitutes breach of contract are one and the same.

In the cases cited by Capolino, by contrast, the conduct that allegedly constituted negligent misrepresentation were actions that induced the plaintiffs to enter into a contract in the first place. In other words, no breach of contract claims even existed in those cases. *See Kimmell v. Schaefer*, 89 N.Y.2d 257, 652 N.Y.S.2d 715,

in fact false, and the complications and indignities allegedly suffered by Capolino, even if real, were merely the slings and arrows of the contract dispute.[63] The remedy for such actions and injuries lies in contract law.

## CONCLUSION

Although the Authority breached the Winbrook contract by failing to certify and pay the undisputed portions of the September payment application, Capolino suffered no damages. Because the cost to complete the contract exceeded the amount remaining, the Authority is entitled to $18,637 plus interest on its third cross-claim for restitution against Capolino. Since the Authority was not entitled to call upon the surety to complete the contracts, General is entitled to $27,038 plus interest on its fourth claim for unjust enrichment. General is also entitled to $24,470 plus interest on its sixth claim against the Authority for unpaid monies for extra work it performed on the fire alarm system, steam control valves and electric door locks.

Because the Authority breached the Schuyler contract by failing to pay any portion of Capolino's September payment application, Capolino is entitled to recover the contract price, less the cost of completion on his first cross-claim for breach of contract. This amount is $26,743, plus interest.

We decline to reach the issue of General's alleged breach of its settlement agreement with Capolino; it is not properly before this court. We further deny Capolino's request for attorney's fees and punitive damages because he has failed to establish the requisite level of culpability on the part of the Authority to justify such an award. Lastly, we reject Capolino's claim for negligent misrep-

resentation against Tascione; this claim is subsumed by his breach of contract claim.

Within one week from the date of this opinion the parties shall submit proposed judgments for the amounts indicated above, with pre-judgment interest from the dates when such amounts were due to have been paid.

SO ORDERED.

675 N.E.2d 450 (1996) (action for negligent misrepresentation based on chief financial officer's negligence in inducing plaintiff to invest); *Tomkins PLC v. Bangor Punta Consolidated Corp.*, 194 A.D.2d 493, 599 N.Y.S.2d 563 (1993) (action for fraud and negligent misrepresentation based on defendants' misrepresentations in inducing plaintiff to enter purchase agreement). Thus, those cases do not address the situation where, as here, a negligent misrepresentation claim is merely a dressed-up version of a contract claim. *Cf. Clark–Fitzpatrick*, 521 N.Y.S.2d at 657, 516 N.E.2d at 194 (gross negligence claim was

"merely a restatement, albeit in slightly different language," of contract claim).

**63.** In addition, as we have noted above, many of the complained of statements (*i.e.*, that Capolino was in default), though in fact incorrect, were not negligent. They were based upon a reasonable interpretation of a complicated dispute involving the relative legality of Capolino's and the Authority's behavior under the contracts. As discussed above, Tascione's statement that Capolino was bankrupt was immediately corrected, and caused no harm.